******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# CONTINENTAL CASUALTY COMPANY ET AL.
## *v.* ROHR, INC., ET AL.
### (AC 41537)
### (AC 41538)
### (AC 42613)

DiPentima, C. J., and Prescott and Bear, Js.*

*Syllabus*

The plaintiff insurance companies sought a declaratory judgment to determine the rights and obligations of the parties under certain policies that the plaintiffs and certain of the defendant insurance companies had issued to the defendant manufacturer R Co. with respect to underlying lawsuits against R Co. concerning environmental contamination at various locations, principally in California, dating back to the 1940s. The plaintiffs sought a judgment declaring that they had no duty to defend or to indemnify R Co. in connection with the underlying claims and that, if the trial court found that they were obligated to defend or to indemnify R Co., they were entitled to contribution from the defendant primary, umbrella and excess insurers. The plaintiff insurance companies included C Co., L Co., and certain London market insurers. The defendants included secondary insurers E Co., S Co., F Co., T Co. and U Co., which had issued certain excess policies to R Co. between 1982 and 1986. Prior to this litigation, the substantive issues of which are governed by California law, R Co. settled certain of its coverage claims with the defendant A Co., the successor in interest to I Co., which had issued to R Co. two primary policies that were in effect between 1959 and 1971. The plaintiffs, which had issued policies to R Co. that were in excess to the 1959–1971 policies, claimed that R Co. had settled with A Co. for less than the total amount of coverage under the 1959–1971 I Co. policies and, thus, R Co. did not fully exhaust its coverage under those policies. The trial court stayed the plaintiffs' contribution claims and bifurcated the proceedings, the first phase of which was limited to the question of when the obligations, if any, of the excess insurers arose in light of the limits of the underlying primary policy or policies. Thereafter, C Co. and several other plaintiffs filed a motion for partial summary judgment in which they claimed that the I Co. primary policies first had to be exhausted before the excess policies could be implicated. The C Co. plaintiffs further claimed that the I Co. policies provided combined limits of $24 million in coverage per occurrence, which had not been exhausted because I Co. had not paid or been held liable to pay its full indemnity limits by judgment or settlement. F Co. and E Co. then filed motions in which they joined the motion for partial summary judgment filed by the C Co. plaintiffs. R Co. thereafter filed motions for partial summary judgment as against the C Co. plaintiffs, F Co. and E Co. R Co. maintained that it was entitled to coverage under its excess policies and that, pursuant to controlling California law and the language of the excess policies, it was required to satisfy only a single per occurrence limit of $2 million to reach the excess insurers' coverage. R Co. further claimed that vertical exhaustion was mandated by the excess policies and that recovery from the excess insurers was not precluded by its settlement under the I Co. primary policies. The trial court rendered judgment granting the motion for partial summary judgment filed by the C Co. plaintiffs, and the joinder motions filed by F Co. and E Co., and denying the motions for partial summary judgment filed by R Co. The court determined that the I Co. primary policies had been in force for four consecutive policy periods, each of which provided $2 million in coverage per occurrence, for a total of $8 million per occurrence for the years the I Co. policies were in effect. The court also determined that the underlying primary policies had to be horizontally exhausted before any of the C Co. plaintiffs' excess policies could attach to provide coverage. The court further determined that R Co. was required to be paid the limits of its underlying primary policies before it could access certain of the excess policies. The court determined that a 1982–1983 policy that was issued by F Co. was specifically excess to a certain

excess policy issued by T Co. that provided $10 million in coverage above an additional $40 million in other underlying insurance. The court also determined that a 1984 policy and a 1985 policy that were issued by F Co. were general excess policies and that the limits of all three F Co. policies could not be triggered because certain underlying policies issued by S Co., T Co. and I Co. constituted other valid insurance that was collectible by the insured. The court determined that the coverage limits of a 1984–1985 excess policy and three 1985–1986 excess policies that were issued by E Co. could not be triggered because underlying policies issued by S Co., T Co., U Co. and I Co. constituted other valid insurance that was collectible by the insured. R Co. filed separate appeals challenging the trial court's judgment for the C Co. plaintiffs and for F Co. and E Co., and the C Co. plaintiffs cross appealed. *Held*:

1. The trial court improperly granted the motion for partial summary judgment filed by the C Co. plaintiffs, as the court's conclusion that their excess policies could never attach was incorrect because A Co. had paid R Co. more than the per occurrence limits of the underlying I Co. primary policies:

a. The C Co. plaintiffs could not prevail on their claim that the I Co. primary policies had a total liability of $24 million over the 1959–1971 period, which was based on their assertion that the three year policy period endorsements to the primary policies were to be treated as annual periods that were subject to a per occurrence limit and that the policy period of each multiyear primary policy was defined as three consecutive annual periods: the trial court properly concluded that each I Co. policy provided a per occurrence limit of $2 million that could not be annualized, the court having correctly determined that the limit of liability provision in each policy set a per occurrence limit for each three year period of the policy and an aggregate limit for multiple occurrences during any annual period; moreover, the provisions of the policies were not ambiguous, as the endorsements stated that the three year policy periods were made up of three annual periods, which was relevant in that rates were based on annual periods, nowhere in the policies or their endorsements was the policy period defined as three consecutive annual periods, and there was no language in the policies or their declarations that provided for coverage on a per occurrence, per year basis.

b. Contrary to the trial court's determination that the I Co. primary policies provided $8 million in coverage because their $2 million per occurrence limits were in force for four consecutive policy periods, R Co. was entitled to $2 million in coverage per policy for a total of $4 million in coverage; the policies' renewal certificates and endorsements constituted continuations of the original contracts such that the limit of liability was the amount stated in the contracts regardless of the number of years involved or the number of premiums that were paid.

c. This court concluded, after an examination of California law, that the trial court did not err in determining that R Co. was required to horizontally exhaust all of its primary insurance before the liability of its excess insurers could attach: this court determined that it would apply the rule of horizontal exhaustion set forth by the California Court of Appeal in *Community Redevelopment Agency* v. *Aetna Casualty & Surety Co.* (50 Cal. App. 4th 329) and other California cases that adhere to the settled rule under California law that an excess policy does not cover a loss until all primary insurance has been exhausted.

d. Although the trial court properly determined that payment of the full limits of the primary policies was necessary for exhaustion to be satisfied, it improperly determined that the necessary exhaustion of the I Co. primary policies remained unsatisfied: because R Co. received payment pursuant to the settlement of the I Co. primary policies for an amount that exceeded the $4 million in coverage under those policies, under the circumstances here, exhaustion by payment of the full amount of the limits of those policies was satisfied, and, as that determination also applied to the H Co. and London excess policies, the trial court improperly determined that a certain London market insurance policy was inaccessible and that no liability could attach under a certain H Co. umbrella policy.

2. R Co.'s claim that the trial court improperly granted F Co.'s motion for summary judgment was unavailing, as R Co. failed to exhaust certain of its excess insurance policies when it entered into settlement agreements with S Co. and T Co.; F Co.'s 1982–1983 and 1984 and 1985 excess policies applied only after the exhaustion of the T Co. and S Co. $10

million excess policies and $40 million in other underlying insurance, and even if R Co. had horizontally exhausted the $40 million in underlying insurance, it failed to exhaust the T Co. and S Co. policies when it settled with T Co. and S Co. for less than the limits of their policies.

3. The trial court properly granted E Co.'s motion for summary judgment as to the 1984–1985 excess policy it issued to R Co. but improperly granted the motion as to three 1985–1986 excess policies it issued to R Co.:

a. Although the trial court improperly concluded that the limits of E Co.'s 1984–1985 policy were not triggered because the I Co. primary policies had not been exhausted, the court's decision as to the 1984–1985 policy was nevertheless proper, that policy having been specifically excess to a directly underlying policy issued by S Co. that had been settled with R Co. for less than its full limits.

b. E Co. was not entitled to summary judgment as to its three 1985–1986 policies, the trial court having incorrectly determined that, to the extent those policies involved the same occurrences covered by the I Co. policies, the limits of E Co.'s 1985–1986 policies had not been triggered because the coverage limits of the I Co. policies had not been satisfied.

4. The C Co. plaintiffs could not prevail on their cross appeal, in which they claimed that the 1959–1971 I Co. primary policies had annual period per occurrence limits that totaled $24 million, this court having rejected similar arguments the C Co. plaintiffs raised on direct appeal with respect to whether the $2 million per occurrence limits in the I Co. policies may be annualized.

Argued February 13—officially released December 15, 2020

*Procedural History*

Action for a declaratory judgment to determine, inter alia, the rights of the parties under certain insurance policies issued to the named defendant by the plaintiffs and certain of the defendants concerning underlying claims of environmental contamination brought against the named defendant, and for other relief, brought to the Superior Court in the judicial district of Hartford, where the defendant Federal Insurance Company et al. filed cross claims and the named defendant filed a counterclaim and a cross claim; thereafter, the court, *Hon. A. Susan Peck*, judge trial referee, bifurcated the trial and ordered that the parties' declaratory judgment claims be tried to the court in the first phase; subsequently, the court granted the motions for partial summary judgment filed by the named plaintiff et al. and the motions for summary judgment filed by the defendant Federal Insurance Company et al., and denied the named defendant's motions for partial summary judgment, and the named defendant appealed and the named plaintiff et al. cross appealed to this court, which consolidated the appeals. *Reversed in part*; *judgment directed*; *further proceedings*.

*Marilyn B. Fagelson*, with whom were *Proloy K. Das*, *Rachel Snow Kindseth*, *Benjamin H. Nissim* and, on the brief, *Steven M. Greenspan*, *Amanda M. Leffler*, pro hac vice, and *Paul A. Rose*, pro hac vice, for the appellant-cross appellee (named defendant).

*Matthew B. Anderson*, pro hac vice, with whom were *William A. Meehan* and, on the brief, *Stephen T. Roberts*, for the appellees-cross appellants (named plaintiff et al.).

*Brian C. Coffey*, pro hac vice, with whom were *Stuart*

*G. Blackburn, Laura Pascale Zaino* and, on the brief, *William M. Cohn,* pro hac vice, for the appellees (defendant Century Indemnity Company et al.).

*Opinion*

BEAR, J. These appeals and cross appeal involve issues relating to whether certain umbrella and excess policies issued by the plaintiff and defendant insurers provide coverage for environmental property damage remediation claims brought against the named defendant, Rohr, Inc. (Rohr).

In Docket No. AC 42613, Rohr appeals from the judgment of the trial court granting the motion for partial summary judgment filed by the plaintiff Continental Casualty Company (Continental), in its own capacity and as successor in interest to certain Harbor Insurance Company insurance policies (Harbor excess policies) and as successor by merger to CNA Casualty of California; the plaintiff Certain Underwriters at Lloyd's, London (Lloyd's); and certain plaintiff London market insurance companies (London insurers), specifically, The Ocean Marine Insurance Company (Ocean Marine) as successor to certain policies severally subscribed to by Commercial Union Assurance Company PLC and/or General Accident Fire & Marine Life Assurance Corporation, and Scottish Lion Insurance Company, Ltd. (Scottish Lion).[1] In Docket No. AC 42613, the Continental plaintiffs cross appealed from the judgment.

In Docket No. AC 41537, Rohr appeals from the judgment of the trial court granting the motion for summary judgment filed by the defendant Federal Insurance Company (Federal), and in Docket No. AC 41538, Rohr appeals from the summary judgment rendered in favor of the defendant Century Indemnity Company (Century), formerly known as California Union Insurance Company.

On appeal in Docket No. AC 42613, Rohr claims that the trial court erred in concluding that (1) the underlying primary insurance policies issued to Rohr by Royal Indemnity Company (Royal) for the period between August 1, 1959, and August 1, 1971 (Royal primary policies), provided per occurrence limits of $8 million, (2) the underlying primary insurance policies must be horizontally exhausted before any of the excess policies could attach to provide coverage, and (3) Rohr was required to be paid those policy limits before it could access certain excess insurance policies. On the cross appeal, the Continental plaintiffs challenge the trial court's determination that the Royal primary policies have a total per occurrence limit of $8 million and claim that the total per occurrence limit of the Royal primary policies is $24 million. For the reasons discussed more fully herein, we reverse in part the judgment of the trial court.

The following undisputed factual and procedural history is relevant to our resolution of the claims on appeal. Over the course of several decades, dating back to the 1940s, environmental contamination occurred at vari-

ous sites located principally in California[2] as a result of manufacturing operations at those sites by Rohr, which is a wholly owned subsidiary of United Technologies Corporation with its principal place of business located in Farmington. Consequently, claims were brought against Rohr seeking recovery for the costs of remediation of those sites, and Rohr, in turn, sought coverage from its insurers for defense and indemnity costs it has incurred, and will continue to incur, related to the remediation. Prior to this litigation, Rohr settled certain of its coverage claims with the defendant Arrowood Indemnity Company (Arrowood), as successor in interest to Royal. Two of the Royal primary policies are directly at issue in the present case: policy RLP 144014, which was in effect between August 1, 1959, and August 1, 1965; and policy RTS 902235, which was in effect between August 1, 1965, and August 1, 1971.[3] The plaintiffs[4] issued policies to Rohr that are excess to the 1959–1971 Royal primary policies. A central dispute between the parties to these appeals concerns the claim by the excess insurers that the amount paid to Rohr under its settlement with Arrowood was less than the total amount of the coverage under the Royal primary policies and, thus, did not fully exhaust the coverage provided under those policies.

In 2016, the plaintiffs commenced the present action against the defendants[5] seeking a declaratory judgment as to the rights and obligations of the parties under certain insurance policies issued to Rohr by the plaintiff insurers and certain of the defendant insurers concerning the underlying environmental property damage claims.[6] Specifically, the plaintiffs sought a judgment declaring: in count one of their complaint, that they have no duty to defend Rohr in connection with the underlying claims; in count two, that they have no obligation to indemnify Rohr concerning the underlying claims; and in count three, that, in the event the court finds that they are obligated to defend or indemnify Rohr, they are entitled to contribution from the defendant primary, umbrella and excess insurers.[7]

On September 26, 2016, the court granted a joint motion of the parties to stay the contribution claims alleged in count three. In a scheduling order issued the same day, the litigation was divided into two phases, with the first phase being limited to the following question: "At what point will the obligations of the excess insurers, if any, arise in light of the limits of the underlying primary policy or policies?" The remaining issues were scheduled to be decided in phase two, if necessary.

On December 16, 2016, the Continental plaintiffs filed a motion for partial summary judgment. In their motion, they claimed that there was no genuine issue of material fact and that they were entitled to summary judgment in their favor because (1) all of the Royal primary policies first had to be exhausted before the excess policies

could be implicated, (2) the Royal primary policies provide combined limits of $24 million in coverage per occurrence, and (3) the Royal primary policies have not been exhausted because Royal has not paid, or been held liable to pay, their full indemnity limits either by judgment or settlement.[8] On January 6, 2017, Federal and Century filed motions joining in the motion for summary judgment filed by the Continental plaintiffs.

On January 23, 2017, Rohr filed a motion for partial summary judgment as to the Continental plaintiffs. In its memorandum in support of its motion and in response to the motion for partial summary judgment filed by those plaintiffs, Rohr maintained that, with respect to the underlying claims, it is entitled to coverage under its excess comprehensive liability policies. Specifically, Rohr claimed, inter alia, that it was "required to satisfy only a single per occurrence limit of $2 million in order to reach the excess insurers' coverage," that "vertical exhaustion is mandated by the language of the excess policies," and that its "settlement [under the Royal primary policies] does not preclude it from recovering against the excess insurers." Rohr further claimed that the excess insurers could not "avoid their obligations to Rohr by complaining that Rohr did not collect enough money in settlement from its primary insurer, Royal. Recent controlling California law, as well as the language of the excess policies and [the] Royal primary policies, compel the conclusion that Rohr need collect only $2 million from Royal before it can recover from the excess insurers." Also on January 23, 2017, Rohr filed a motion for partial summary judgment as to Federal and Century, incorporating by reference its combined memorandum in opposition to the motions for summary judgment filed by Federal and Century and in support of its motion for partial summary judgment as to those defendants, and all of the exhibits thereto. Rohr claimed, inter alia, that the joinder motions for summary judgment filed by Federal and Century failed for the same reasons set forth in Rohr's opposition to the motion for partial summary judgment filed by the Continental plaintiffs.

In a memorandum of decision dated March 19, 2018, the court, *Hon. A. Susan Peck*, judge trial referee, rendered judgment granting the motion for partial summary judgment filed by the Continental plaintiffs and the joinder motions for summary judgment filed by Federal and Century, and denying Rohr's motions for partial summary judgment. On April 9, 2018, Rohr filed its appeal in Docket No. AC 41537 challenging the summary judgment rendered in favor of Federal, its appeal in Docket No. AC 41538 challenging the summary judgment rendered in favor of Century, and its appeal in Docket No. AC 41540 challenging the summary judgment rendered in favor of the Continental plaintiffs. On that day, Rohr also filed a motion, pursuant to Practice Book § 61-4, for a written determination of appealability

of the court's decision regarding the parties' motions for summary judgment. In its motion, Rohr alleged that the decision was a final appealable judgment as to Federal and Century because it resolved all claims between Rohr and those parties. With respect to the Continental plaintiffs, Rohr acknowledged that the decision did not resolve all issues concerning coverage obligations for all policies with those parties and left issues regarding the remaining policies to be addressed in the next phase of the litigation. Rohr claimed, however, that because the issues to be addressed in its appeal from the summary judgment rendered in favor of Federal and Century were related closely to those raised in the summary judgment rendered in favor of the Continental plaintiffs, "it would be the most efficient use of judicial resources to grant the . . . motion so that an appeal from [the summary judgment rendered in favor of the Continental plaintiffs] . . . can be consolidated with the aforementioned appeals and argued by all of the affected parties at the same time." (Citation omitted.) The trial court granted Rohr's motion on May 25, 2018.

Subsequently, on January 16, 2019, this court granted Rohr's motion to consolidate its appeals in Docket Nos. AC 41537 and AC 41538, dismissed the appeal and cross appeal in Docket No. AC 41540 for lack of a final judgment, as the decision appealed from did not dispose of the entire complaint or all causes of action with respect to the Continental plaintiffs, and denied Rohr's request for permission to appeal pursuant to Practice Book § 61-4. On February 15, 2019, this court granted Rohr's motion for reconsideration, as well as its motion for permission to appeal. Thereafter, Rohr filed the appeal in Docket No. AC 42613 challenging the summary judgment rendered in favor of the Continental plaintiffs, which, in turn, filed a cross appeal. The three appeals subsequently were consolidated.

The parties do not dispute that the substantive issues in this action are governed by California law. It is well established, however, "that in a choice of law situation the forum state will apply its own procedure . . . . *Paine Webber Jackson & Curtis, Inc.* v. *Winters*, 22 Conn. App. 640, 650, 579 A.2d 545, cert. denied, 216 Conn. 820, 581 A.2d 1055 (1990); see, e.g., *Ferri* v. *Powell-Ferri*, 326 Conn. 438, 447, 165 A.3d 1137 (2017) ([a]lthough the choice of law provision in the [trust at issue] dictates that matters of substance will be analyzed according to Massachusetts law, procedural issues such as the standard of review [and standing] are governed by Connecticut law); *Montoya* v. *Montoya*, 280 Conn. 605, 612 n.7, 909 A.2d 947 (2006) ([a]lthough the [premarital] agreement's choice of law provision dictates that the substance of the contract will be analyzed according to New York law, procedural issues such as the applicable standard of review are governed by Connecticut law) . . . ." (Citation omitted; internal quotation marks omitted.) *Reclaimant Corp.* v.

*Deutsch*, 332 Conn. 590, 603, 211 A.3d 976 (2019). Accordingly, we set forth our standard of review pursuant to Connecticut law.

The standard of review applicable to a trial court's decision to grant a motion for summary judgment is well established. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A party moving for summary judgment is held to a strict standard. . . . To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent." (Internal quotation marks omitted.) *Raczkowski* v. *McFarlane*, 195 Conn. App. 402, 408, 225 A.3d 305 (2020); see also *Cyr* v. *VKB, LLC*, 194 Conn. App. 871, 877, 222 A.3d 965 (2019). "A material fact is a fact that will make a difference in the outcome of the case. . . . Once the moving party has presented evidence in support of the motion for summary judgment, the opposing party must present evidence that demonstrates the existence of some disputed factual issue . . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book § [17-45]." (Internal quotation marks omitted.) *Streifel* v. *Bulkley*, 195 Conn. App. 294, 300, 224 A.3d 539, cert. denied, 335 Conn. 911, 228 A.3d 375 (2020). "Our review of the trial court's decision to grant [a] motion for summary judgment is plenary." (Internal quotation marks omitted.) *Lucenti* v. *Laviero*, 327 Conn. 764, 773, 176 A.3d 1 (2018).

I

INSURANCE LAW PRINCIPLES

Because the trial court's resolution of the issues raised in the motions for summary judgment involved a discussion and application of various technical concepts and terms related to insurance contract interpretation under California law, before we address the merits of the court's decision, a discussion of those principles and concepts, as well as the terms of the insurance policies at issue, is necessary.

A

Primary and Excess Insurance

We first discuss the distinctions between primary and excess insurance coverage. "Primary coverage is insurance coverage whereby, under the terms of the policy, liability attaches immediately upon the happen-

ing of the occurrence that gives rise to liability. . . . Primary insurers generally have the primary duty of defense. Excess or secondary coverage is coverage whereby, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted." (Emphasis omitted; internal quotation marks omitted.) *Century Surety Co.* v. *United Pacific Ins. Co.*, 109 Cal. App. 4th 1246, 1255, 135 Cal. Rptr. 2d 879 (2003), review denied, California Supreme Court, Docket No. S117884 (September 17, 2003); see also *Legacy Vulcan Corp.* v. *Superior Court*, 185 Cal. App. 4th 677, 689, 110 Cal. Rptr. 3d 795 (2010), review denied, California Supreme Court, Docket No. S184633 (September 1, 2010). "[E]xcess insurance is insurance that is expressly understood by both the insurer and insured to be secondary to specific underlying coverage which will not begin until after that underlying coverage is exhausted and which does not broaden that underlying coverage. . . . California case law has consistently protected the limited and shielded position of the excess carrier when the obligations of the excess carrier are set in clear phrases." (Citations omitted; internal quotation marks omitted.) *Qualcomm, Inc.* v. *Certain Underwriters at Lloyd's, London*, 161 Cal. App. 4th 184, 194, 73 Cal. Rptr. 3d 770 (2008), review denied, California Supreme Court, Docket No. S163293 (June 11, 2008); see also *Century Surety Co.* v. *United Pacific Ins. Co.*, supra, 1255. "Unless the provisions of an excess policy provide otherwise, an excess insurer has no obligation to provide a defense to its insured before the primary coverage is exhausted." *Community Redevelopment Agency* v. *Aetna Casualty & Surety Co.*, 50 Cal. App. 4th 329, 338, 57 Cal. Rptr. 2d 755 (1996); see also *North River Ins. Co.* v. *American Home Assurance Co.*, 210 Cal. App. 3d 108, 112, 257 Cal. Rptr. 129 (1989) ("[l]iability under an excess policy attaches only after all primary coverage has been exhausted").

As in the present case, an insured may have several layers of excess or secondary insurance, and "[w]hen secondary insurance is written to be excess to identified policies, it is said to be 'specific excess.' " *Olympic Ins. Co.* v. *Employers Surplus Lines Ins. Co.*, 126 Cal. App. 3d 593, 598, 178 Cal. Rptr. 908 (1981). "When California courts refer to differing 'levels' of coverage in excess insurance policies, they are referring to whether the policy is a 'specific excess' or a 'general excess' insurance policy. A specific excess insurance policy is an insurance policy that 'provide[s] excess coverage *only* over specified primary policies.' . . . Thus, a specific excess policy must pay as soon as the limits of the specified underlying insurance are exhausted. . . . In contrast, general excess insurance policies 'provide coverage only when all primary policies are exhausted.' . . . This is called 'horizontal exhaustion' because each primary policy on the lower 'level' must exhaust before a general excess policy, which sits on a higher level,

becomes implicated." (Citations omitted; emphasis in original.) *St. Paul Fire & Marine Ins. Co.* v. *Ins. Co. of the State of Pennsylvania*, Docket No. 15-CV-02744-LHK, 2017 WL 897437, *14 (N.D. Cal. March 7, 2017); see also *Padilla Construction Co.* v. *Transportation Ins. Co.*, 150 Cal. App. 4th 984, 986–87, 58 Cal. Rptr. 3d 807 (2007) ("California's rule of 'horizontal exhaustion' in liability insurance law requires all primary insurance to be exhausted before an excess insurer must 'drop down' to defend an insured, including in cases of continuing loss. . . . Unless there is excess insurance that describes underlying insurance and promises to cover a claim when that specific underlying insurance is exhausted ('vertical exhaustion'), the rule of horizontal exhaustion applies to cases of alleged continuing property damage . . . ." (Citation omitted; footnote omitted.)).

In contrast, under vertical exhaustion, "coverage attaches under an excess policy when the limits of a specifically scheduled underlying policy [are] exhausted and the language of the excess policy provides that it shall be excess only to that specific underlying policy." *Community Redevelopment Agency* v. *Aetna Casualty & Surety Co.*, supra, 50 Cal. App. 4th 339–40. Moreover, the principle that a secondary policy "does not apply to cover a loss until the underlying primary insurance has been exhausted . . . holds true even where there is more underlying primary insurance than contemplated by the terms of the secondary policy." *Olympic Ins. Co.* v. *Employers Surplus Lines Ins. Co.*, supra, 126 Cal. App. 3d 600.

B

Principles Governing Continuous Loss Cases

Environmental injury cases such as the present one, in which the harm is alleged to have occurred over the course of multiple years and policy periods, involve what has been termed "long-tail" injuries. Such injuries involve "a series of indivisible injuries attributable to continuing events without a single unambiguous cause. Long-tail injuries produce progressive damage that takes place slowly over years or even decades." (Internal quotation marks omitted.) *California* v. *Continental Ins. Co.*, 55 Cal. 4th 186, 195–96, 281 P.3d 1000, 145 Cal. Rptr. 3d 1 (2012) (*Continental Ins. Co. I*). In cases involving long-tail injuries, the relationship between primary and excess insurance can be complex, as "[i]t is often virtually impossible for an insured to prove what specific damage occurred during each of the multiple consecutive policy periods in a progressive property damage case." (Internal quotation marks omitted.) Id., 196; see id. (explaining that "many insurers are unwilling to indemnify insureds for long-tail claims" and that their refusal to do so often causes insureds to bring complex actions seeking coverage, which involve large numbers of litigants and insurance policies covering

multiple years and policy periods).

There are three California Supreme Court cases that primarily inform our discussion of the general principles governing long-tail injury or continuous loss cases: *Montrose Chemical Corp. of California* v. *Admiral Ins. Co.*, 10 Cal. 4th 645, 913 P.2d 878, 42 Cal. Rptr. 2d 324 (1995) (*Montrose I*), *Aerojet-General Corp.* v. *Transport Indemnity Co.*, 17 Cal. 4th 38, 948 P.2d 909, 70 Cal. Rptr. 2d 118 (1997) (*Aerojet*), and *Continental Ins. Co. I*, supra, 55 Cal. 4th 186.

In the first case, *Montrose I*, the question before the court was "whether four comprehensive general liability . . . policies issued by [the] defendant . . . Admiral Insurance Company (Admiral) to [the] plaintiff . . . Montrose Chemical Corporation of California [Montrose Chemical] obligate Admiral to defend Montrose [Chemical] in lawsuits seeking damages for continuous or progressively deteriorating bodily injury and property damage that occurred during the successive policy periods." *Montrose I*, supra, 10 Cal. 4th 654. The losses were allegedly caused by the disposal of hazardous wastes by Montrose Chemical "at times predating the commencement of Admiral's policy periods." Id.

In addressing the "issue of when potential coverage is triggered under a [comprehensive general liability] policy where the underlying third party claims involve continuous or progressively deteriorating damage or injury"; id., 661; the court concluded that "the continuous injury trigger of coverage[9] should be applied to the underlying third party claims of continuous or progressively deteriorating damage or injury alleged to have occurred during Admiral's policy periods. Where, as here, successive [comprehensive general liability] policy periods are implicated, bodily injury and property damage which is continuous or progressively deteriorating throughout several policy periods is potentially covered by all policies in effect during those periods." (Footnote added.) Id., 689. The court explained: "[I]t has long been understood that the standard form [comprehensive general liability] policy provides liability coverage for damage or injury occurring during the policy period which results from an accident, or from continuous or repeated exposure to injurious conditions. There is no requirement that the sudden, accidental damage-causing act or event, or the conditions giving rise to the damage or injury, themselves occur within the policy period in order for potential liability coverage to arise. . . . [W]here successive [comprehensive general liability] policies have been purchased, bodily injury and property damage that is continuing or progressively deteriorating throughout more than one policy period is potentially covered by all policies in effect during those periods." (Citation omitted; emphasis omitted; footnote omitted.) Id., 686–87; see also *Padilla Construction Co.* v. *Transportation Ins. Co.*, supra, 150

Cal. App. 4th 987 (explaining that, in *Montrose I*, the California Supreme Court "adopted a 'continuous injury trigger' as the test for the defense obligation of traditional, occurrence-based primary commercial liability insurance when the underlying claims involve continuous or deteriorating damage" and that "[t]he continuous injury trigger generally means . . . that all primary insurers over the time of the alleged continuous injury will be obligated to defend an underlying action claiming such continuous damage").

In the second case, *Aerojet*, supra, 17 Cal. 4th 38, the California Supreme Court adopted the "all sums" approach. Specifically, the court held that, "based on standard policy language, in which the insurer promises to pay 'all sums' that the insured becomes legally obligated to pay as damages, the insurer's duty to indemnify the insured 'extends to all specified harm caused by an included occurrence, even if some such harm results beyond the policy period.' " *California* v. *Continental Ins. Co.*, 15 Cal. App. 5th 1017, 1029–30, 223 Cal. Rptr. 3d 716 (2017) (*Continental Ins. Co. II*) (quoting *Aerojet*, supra, 56–57), review denied, California Supreme Court, Docket No. S245241 (December 20, 2017).

Finally, in the third case, *Continental Ins. Co. I*, supra, 55 Cal. 4th 186, the California Supreme Court addressed the issue of stacking. First, the court explained its prior ruling in *Aerojet*, noting, "the settled rule of the case law is that an insurer on the risk when continuous or progressively deteriorating [property] damage or [bodily] injury first manifests itself remains obligated to indemnify the insured for the entirety of the ensuing damage or injury. . . . In other words, under *Aerojet*, as long as the policyholder is insured at some point during the continuing damage period, the insurers' indemnity obligations persist until the loss is complete, or terminates." (Citations omitted; emphasis omitted; internal quotation marks omitted.) Id., 197.

In light of the language of the applicable policies obligating the insurers to pay " 'all sums which the [i]nsured shall become obligated to pay . . . for damages . . . because of injury to or destruction of property' "; id., 199; the court in *Continental Ins. Co. I* was constrained to apply the all sums coverage principles and concluded that the policies at issue obligated "the insurers to pay all sums for property damage attributable to [a particular waste] site, up to their policy limits, if applicable, as long as some of the continuous property damage occurred while each policy was on the loss." (Internal quotation marks omitted.) Id., 200. Specifically, the court explained: "[T]he all sums indemnity coverage . . . envisions that each successive insurer is potentially liable for the entire loss up to its policy limits. When the entire loss is within the limits of one policy, the insured can recover from that insurer, which may then seek contribution from the other insurers on

the risk during the same loss. Recognizing, however, that this method stops short of satisfying the coverage responsibilities of the policies covering a continuous long-tail loss, and potentially leaves the insured vastly uncovered for a significant portion of the loss, the . . . Court of Appeal allowed the insured to stack the consecutive policies and recover up to the policy limits of the multiple plans. 'Stacking' generally refers to the stacking of policy limits across multiple policy periods that were on a particular risk. In other words, '[s]tacking policy limits means that when more than one policy is triggered by an occurrence, each policy can be called upon to respond to the claim up to the full limits of the policy.' " Id. Accordingly, "[t]he all-sums-with-stacking indemnity principle properly incorporates the *Montrose* [*I*] continuous injury trigger of coverage rule and the *Aerojet* all sums rule, and 'effectively stacks the insurance coverage from different policy periods to form one giant "uber-policy" with a coverage limit equal to the sum of all purchased insurance policies. Instead of treating a long-tail injury as though it occurred in one policy period, this approach treats all the triggered insurance as though it were purchased in one policy period. The [insured] has access to far more insurance than it would ever be entitled to within any one period.' . . . The all-sums-with-stacking rule means that the insured has immediate access to the insurance it purchased. It does not put the insured in the position of receiving less coverage than it bought. It also acknowledges the uniquely progressive nature of long-tail injuries that cause progressive damage throughout *multiple* policy periods." (Citation omitted; emphasis in original.) Id., 201.

## C

### Rules of Insurance Contract Interpretation

We next set forth the well established rules of insurance contract interpretation under California law that guide our analysis of the claims on appeal. The California Supreme Court has stated: "Insurance policies are contracts and, therefore, are governed in the first instance by the rules of construction applicable to contracts. Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs its interpretation. . . . Such intent is to be inferred, if possible, solely from the written provisions of the contract. . . . The clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, controls judicial interpretation unless used by the parties in a technical sense, or unless a special meaning is given to them by usage. . . . If the meaning a layperson would ascribe to the language of a contract of insurance is clear and unambiguous, a court will apply that meaning. . . .

"In contrast, [i]f there is ambiguity . . . it is resolved by interpreting the ambiguous provisions in the sense

the promisor (i.e., the insurer) believed the promisee understood them at the time of formation. . . . If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist. . . . This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, the objectively reasonable expectations of the insured. . . . Only if this rule does not resolve the ambiguity do we then resolve it against the insurer. . . . [I]n the insurance context, we generally resolve ambiguities in favor of coverage. . . . Similarly, we generally interpret the coverage clauses of insurance policies broadly, [in order to protect] the objectively reasonable expectations of the insured. . . . These rules stem from the fact that the insurer typically drafts policy language, leaving the insured little or no meaningful opportunity or ability to bargain for modifications." (Citations omitted; internal quotation marks omitted.) *Montrose I*, supra, 10 Cal. 4th 666–67; see also *Falkowski* v. *Imation Corp.*, 132 Cal. App. 4th 499, 505–506, 33 Cal. Rptr. 3d 724 (2005), review denied, California Supreme Court, Docket No. S137944 (November 30, 2005); *Wells Fargo Bank, N.A.* v. *California Ins. Guarantee Assn.*, 38 Cal. App. 4th 936, 942–43, 45 Cal. Rptr. 2d 537 (1995). "[C]onstruction of a contract of insurance presents a question of law [that] this court reviews de novo. . . . *Lexington Ins. Co.* v. *Lexington Healthcare Group, Inc.*, 311 Conn. 29, 37, 84 A.3d 1167 (2014). Because all of the . . . claims on appeal relate to an interpretation of the [insurance] polic[ies], our review is plenary." (Internal quotation marks omitted.) *Gabriel* v. *Mount Vernon Fire Ins. Co.*, 186 Conn. App. 163, 167, 199 A.3d 79 (2018), cert. denied, 331 Conn. 903, 201 A.3d 1023 (2019); see also *Chicago Title Ins. Co.* v. *Bristol Heights Associates, LLC*, 142 Conn. App. 390, 405, 70 A.3d 74, cert. denied, 309 Conn. 909, 68 A.3d 662 (2013).

## II

### INSURANCE POLICIES OF ROYAL AND THE CONTINENTAL PLAINTIFFS

#### A

##### Royal Primary Policies

We next set forth the terms of the primary policies issued by Royal, now known as Arrowood, to Rohr. Pursuant to comprehensive general liability policy RLP 144014, Royal agreed "[t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof." The policy period covered August 1, 1959, to August 1, 1962, and provided coverage in the amount of $2 million in the aggregate annually and $2 million per occurrence during the policy period. An occurrence is defined as

"an event or continuous or repeated exposure to conditions, which unexpectedly cause injury or damage during the policy period. All such exposure to substantially the same general conditions or arising from the same cause shall be deemed one occurrence." Pursuant to the policy declarations, "[t]he policy period stated in the declaration is comprised of three consecutive annual periods."

The policy is also subject to the following condition: "The limit of liability stated in the declarations as applicable to 'each occurrence' is the limit of the Company's liability for all damages, including damages for care and loss of services arising out of bodily injury, sickness or disease, including death at any time resulting therefrom sustained by one or more persons or damages arising out of injury to or destruction of all property of one or more persons or organizations, including the loss of use thereof, as a result of any one occurrence, regardless of whether such damages are payable under one or more coverages. Subject to the limit of liability with respect to 'each occurrence,' the limit of liability stated in the declarations as 'aggregate' is the total limit of the Company's liability with respect to all occurrences taking place during any annual term of this policy." Policy RLP 144014 was extended by three years from August 1, 1962, to August 1, 1965, pursuant to a renewal certificate, which provided that the same terms and conditions in the policy would continue in full force and effect.

Royal also issued to Rohr comprehensive general liability policy RTS 902235. The policy period for that policy was in effect from August 1, 1965, to August 1, 1968, and it also provided coverage in the amount of $2 million per occurrence and $2 million in the aggregate per annual period. Policy RTS 902235 contained essentially the same terms, conditions, definitions and exclusions as policy RLP 144014. Policy RTS 902235 was extended for a second three year period from August 1, 1968, to August 1, 1971.

### B

### Harbor and London Excess Policies

### 1

### Harbor Excess Policies

Harbor Insurance Company (Harbor) issued a number of excess comprehensive liability policies to Rohr. The language of policy 102211 is indicative of many of those policies, and, therefore, we discuss it more fully herein.[10] Policy 102211, which was in effect from August 1, 1964, to August 1, 1967, provided coverage limits of up to $5 million per occurrence and $5 million in the aggregate per policy year. An occurrence is "deemed to have the same meaning . . . as is attributed to [it] in the [policies] of the primary insurers," and a policy year is defined as "a period of one calendar year . . . ."

Harbor excess policy 102211 identifies Royal primary policy RLP 144014 as a primary insurance policy with respect to comprehensive general liability.

Pursuant to policy 102211, Harbor agreed "to pay on behalf of the Assured all sums which the Assured shall become legally obligated to pay, or by final judgment be adjudged to pay, to any person or persons as damages . . . (b) for damage to or destruction of property of others . . . occurring during the period of this Insurance . . . ." Furthermore, liability attaches to the insurer "only in respect of such hazards as are set forth in item 1 of the [accompanying] Schedule and . . . only after the Primary and Underlying Excess Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability . . . ." Specifically, the policy states that liability to pay shall not attach "unless and until the Primary and Underlying Excess Insurers shall have admitted liability for the Primary and Underlying Excess Limit(s) or unless and until the Assured has by final judgment been adjudged to pay an amount which exceeds such Primary and Underlying Excess Limit(s) and then only after the Primary and Underlying Excess Insurers have paid or have been held liable to pay the full amount of the Primary and Underlying Excess Limit(s)." Finally, the policy defines "ultimate net loss" to mean "the amount payable in settlement of the liability of the Assured after making deductions for all recoveries and for other valid and collectible insurances, excepting, however, the policy/ies of the Primary and Underlying Excess Insurers, and shall exclude all expenses and Costs."[11]

## 2

### London Excess Policies

Paragraph 159 of the complaint alleges that certain of the plaintiffs, including Lloyd's, Scottish Lion, Ocean Marine, Winterthur Swiss Insurance Corporation, Ltd., Tenecom, formerly known as Yasuda Insurance Company, Nissan Fire & Marine Insurance Company, Ltd., and NRG N.V., "individually severally subscribed, each in his/her/its own proportionate share and not for any other," to sixteen listed excess liability insurance policies, which are collectively referred to in this opinion as the London excess policies.[12] The complaint further alleges that "[t]he London excess policies provide limits of liability in excess of the underlying insurance, which must be exhausted before" there is any liability to pay under those excess policies.

Like the Harbor excess policies, the London excess policies contain similar provisions governing the attachment of liability and defining ultimate net loss, although they vary in the amount of coverage provided for an occurrence. For example, the London excess policies contain the following or similar provision regarding the attachment of liability: "Liability to pay under this

Insurance shall not attach unless and until the Primary and Underlying Excess Insurers shall have admitted liability for the Primary and Underlying Excess Limit(s) or unless and until the Assured has by final judgment been adjudged to pay an amount which exceeds such Primary and Underlying Excess Limit(s) and then only after the Primary and Underlying Excess Insurers have paid or have been held liable to pay the full amount of the Primary and Underlying Excess Limit(s)."[13] The London excess policies similarly define ultimate net loss to mean "the amount payable in settlement of the liability of the Assured after making deductions for all recoveries and for other valid and collectible insurances, excepting however the policy/ies of the Primary and Underlying Excess Insurers, and shall exclude all expenses and Costs."

### 3
### Whether the Harbor and London Excess Policies Are Specific or General Excess Policies

Before we can address the claims raised in this appeal, we must first determine whether the trial court properly concluded that the Harbor excess policies and the London excess policies are general, instead of specific, excess policies.

Rohr claims that "the language in nearly all of the excess policies here [shows that they] are excess to specifically identified underlying policies and/or to a specified sum of underlying limits and, therefore, clearly require vertical exhaustion." Rohr further alleges that the court in *Community Redevelopment Agency* v. *Aetna Casualty & Surety Co.*, supra, 50 Cal. App. 4th 329, "recognized that where a policy provides that it is excess only to a specific underlying policy, vertical exhaustion applies." In opposition, the Continental plaintiffs contend that the Harbor and London excess policies are general excess policies, to which the rule of horizontal exhaustion applies. Specifically, they claim that, "[h]ere, because the excess policies provide that they are excess above the other insurance which contribute[s] to payment of the loss, along with the specified primary insurance, they are similarly not limited to only the specifically described underlying insurance." They further assert that "Rohr's contention that the excess policies' attachment point is dependent only on the payment of a single specified sum is contrary to the policies' ultimate net loss and other insurance provisions, as well as the [holding] in *Peerless* [*Casualty Co.* v. *Continental Casualty Co.*, 144 Cal. App. 2d 617, 301 P.2d 602 (1956)][14] . . . . Accordingly, when reading the schedule of underlying insurance and attachment of liability and ultimate net loss provisions together, it is clear the excess policies are only reached once the underlying insurers have paid or been held liable to pay and the calculation of ultimate net loss, which reduces the amounts of 'all recoveries' and 'for

valid and collectible insurances,' including all insurance not directly underlying (which, in turn, must be exhausted by payment)." (Footnote added.)

In its memorandum of decision, the trial court addressed this issue and stated: "In this case, while the schedule pages of the excess policies reference the Royal primary policy RLP 144014, the excess policies specifically provide that the policies will attach '*only after the Primary and Underlying Excess Insurers have paid or have been held liable to pay the full amount of the Primary and Underlying Excess Limit(s)*.' . . . Based upon this language, the Harbor and London policies provide for the upper layer excess policies to pay their respective limits only once the insured has recovered all proceeds from all valid and collectible underlying insurance, including all primary policies.

"That the excess policies *make reference to*[15] the Royal primary policy in the schedule or declaration is not enough, in and of itself, to warrant a conclusion that the policies are 'specific excess' and subject to a vertical exhaustion allocation scheme; as previously stated, horizontal exhaustion is the rule in California in long-tail cases unless specific policy language *both describes and limits* the underlying policies. . . . Moreover, there are no other specific references here to the Royal primary policies, which, when read in conjunction with the 'ultimate net loss' and 'other insurance' provisions, would overcome the usual presumption requiring exhaustion of all primary coverage policies in effect during the period of continuing damage. Liability under the Harbor and London [excess] policies, therefore, attaches only after all primary policies have been exhausted. Accordingly, the Harbor and London policies, construed in their entirety, are general excess policies, and liability under these contracts will not attach before all primary insurance has been exhausted." (Citation omitted; emphasis in original; footnote added.) We agree with the trial court's conclusion.

We find *Community Redevelopment Agency* v. *Aetna Casualty & Surety Co.*, supra, 50 Cal. App. 4th 329, instructive on this issue. In that case, the court stated: "[W]e must conclude that when a policy which provides excess insurance above a stated amount of primary insurance contains provisions which make it also excess insurance above *all other* insurance which contributes to the payment of the loss together with specifically stated primary insurance, *such clause will be given effect as written*. . . . In other words, an excess insurer can require in its policy that all primary insurance be first exhausted. Consistent with the horizontal rule, that is what [the excess insurer] effectively did in this case. Because exhaustion of all available primary (or underlying) insurance never occurred, [the excess insurer's] duty, under the terms of its policy, to 'drop

down' and provide a defense never arose." (Citation omitted; emphasis in original.) Id., 341; see also *Peerless Casualty Co.* v. *Continental Casualty Co.*, supra, 144 Cal. App. 2d 626; cf. *Travelers Casualty & Surety Co.* v. *Transcontinental Ins. Co.*, 122 Cal. App. 4th 949, 959, 19 Cal. Rptr. 3d 272 (2004) (concluding that, unlike in *Community Redevelopment Agency*, language of excess policy was " 'sufficiently clear' " to trigger defense obligations of excess insurer upon exhaustion of underlying insurance as defined in policy, regardless of existence of other insurance), review denied, California Supreme Court, Docket No. S127264 (September 29, 2004).

In *St. Paul Fire & Marine Ins. Co.* v. *Ins. Co. of the State of Pennsylvania*, supra, 2017 WL 897437, *14, the court further explained: "California courts consider specific excess policies to be on a lower level than general excess policies and, thus, specific excess policies must pay before general excess policies. . . . In cases involving continuing losses over multiple years, thus triggering multiple annual policies, the default in California is for an excess insurance policy to be a general excess policy. . . . However, this default is rebutted if the insurance policy contains language stating that the policy is excess to a specific underlying policy. . . . Even where a specific underlying policy is listed, other provisions in the policies such as the 'other insurance' provision may indicate that the policy remains a general excess policy." (Citations omitted.)

In the present case, the Harbor and London excess policies contain similar language providing that liability shall attach to the insurer only after the primary and underlying excess insurers have paid or have been held liable to pay the full amount of the primary and underlying excess limits or their respective ultimate net loss liability, which is defined as an amount payable in settlement of the liability of the insured "after making deductions for all recoveries and for *other valid and collectible insurances* . . . ." (Emphasis added.) The policies of those excess insurers, which clearly require that the primary insurance first be exhausted before any obligations of those excess insurers arise and contain provisions making those policies excess above "other valid and collectible insurances," do not contain language specifically limiting those policies to be excess above only the Royal primary policy. See *Travelers Casualty & Surety Co.* v. *Transcontinental Ins. Co.*, supra, 122 Cal. App. 4th 959. Accordingly, we conclude that the trial court properly determined that the Harbor and London excess policies are general excess policies.[16]

## C

### Harbor Umbrella Policy

Harbor umbrella policy 108909 contains some terms that vary from the other Harbor excess policies. The

limit of liability in the Harbor umbrella policy is $3 million per occurrence and $3 million in the aggregate, and the policy is excess to, inter alia, Royal primary policy RTS 902235, and Harbor excess policies 108908 and 108907. Pursuant to the "Loss Payable" provision of the umbrella policy, liability with respect to any occurrence "shall not attach unless and until the Assured, or the Assured's Underlying Insurer, shall have paid the amount of the underlying limits on account of such occurrence." The "Limit of Liability" provision states that, "[i]n the event of reduction or exhaustion of the aggregate limits of liability under said underlying insurance by reason of losses paid thereunder, this Insurance shall (1) in the event of reduction pay the excess of the reduced underlying limit; (2) in the event of exhaustion continue in force as underlying insurance." Under the "Other Insurance" clause, "[i]f other valid and collectible coverage with any other Insurer is available to the Assured covering a loss also covered by this Insurance, other than coverage that is in excess of the Insurance afforded hereunder, the Insurance afforded hereunder shall be in excess of and shall not contribute with such other Insurance. Nothing herein shall be construed to make this Insurance subject to the terms, conditions and limitations of other Insurance." The trial court, after examining those provisions, stated: "The umbrella policy's language thus provides that, in the event that a loss is not fully covered under the underlying insurances, the umbrella policy itself will continue to provide coverage as though it were an underlying insurance policy. The policy's plain language also provides that, if a loss is covered by the underlying insurance, then the policy shall not contribute with the underlying insurance policy. Additionally, the language plainly provides that, in the event the underlying insurance is exhausted, then the Harbor umbrella policy has the capacity to continue on as underlying insurance, or act as an excess insurance policy.

"In these circumstances, there exists valid and collectible insurance in the form of the Royal primary policy [RTS] 902235. According to its plain terms, the Harbor umbrella policy shall not contribute with the Royal primary policy. Additionally, if the Royal primary policy has exhausted its limits, then the Harbor umbrella policy will continue as underlying insurance, or act as excess insurance. Both options under the Harbor policy contemplate that the underlying primary insurer shall have paid its underlying limits before liability attaches under the policy. If the underlying primary insurance has not been exhausted, then liability shall not attach under the Harbor umbrella policy." We will address whether liability has attached under the Harbor umbrella policy in part III C of this opinion.

III

THE CONTINENTAL PLAINTIFFS' MOTION

FOR PARTIAL SUMMARY JUDGMENT

The trial court explained the essence of the dispute between the parties as follows: "For purposes of the present motions for summary judgment, there is no real dispute regarding the relevant facts . . . [including] . . . the fact that the underlying claims arise from alleged damages resulting over the course of decades from the gradual or continuous release of toxic chemicals into the environment. Nor do the parties disagree regarding the fact that Rohr reached a settlement with its primary insurer and the dollar amount of that settlement.[17]

"The issues before the court, therefore, are purely questions of law, namely, the interpretation of the terms of the various insurance policies issued to Rohr by the excess insurers, and the legal effect, if any, of the settlement on the excess insurers' liability to Rohr in light of that interpretation. Central to the resolution of these issues is the court's interpretation of language in Rohr's primary and excess [comprehensive general liability] policies. A key point of disagreement is the interpretation of provisions in Rohr's primary [comprehensive general liability] policies defining the limits of liability under those policies. The excess insurers maintain that the $2 million 'per occurrence' and 'aggregate' limits in the primary policies, under the circumstances of this case, effectively provide $2 million of coverage per year that the policies were in effect, for a total effective limit of $24 million that must be exhausted before the excess policies may be accessed. Rohr, on the other hand, takes the position that the primary policy limits are exhausted once $2 million have been paid out for any one occurrence, and that the excess policies become accessible at that point." (Footnote added; footnote omitted.)

We first address Rohr's claims on appeal with respect to the judgment of the trial court granting the motion for partial summary judgment filed by the Continental plaintiffs.

A

Per Occurrence Limits

Rohr's first claim on appeal is that the trial court erred in concluding that the Royal primary policies provided per occurrence limits of $8 million. Specifically, Rohr claims that the trial court's conclusion that there was $8 million in per occurrence coverage under the Royal primary policies was improper because the court "incorrectly treated each of the two policies, and each of the two policy extensions, as providing separate $2 million limits that could be added together." We agree.

The following additional facts are necessary to our resolution of this claim. As stated previously, there are two Royal primary policies that are directly at issue in the present case, each of which covered a three year

period and was extended for an additional three years: policy RLP 144014, which was in effect between August 1, 1959, and August 1, 1962, and was extended to cover the period between August 1, 1962, and August 1, 1965; and policy RTS 902235, which was in effect between August 1, 1965, and August 1, 1968, and was extended to cover the period between August 1, 1968, and August 1, 1971. Both policies provided coverage in the amount of $2 million in the aggregate and $2 million per occurrence and similarly define an occurrence as follows: " 'Occurrence' means an event or continuous or repeated exposure to conditions which unexpectedly cause injury or damages *during the policy period*. All such exposure to substantially the same general conditions or arising from the same cause shall be deemed one occurrence." (Emphasis added.)

In support of its claim, Rohr relies on the language of the limit of liability clause in each of the policies, which provides that "[t]he limit of liability stated in the declarations as applicable to 'each occurrence' is the limit of the Company's liability for all . . . damages arising out of injury to or destruction of all property of one or more persons or organizations . . . as a result of any one occurrence, regardless of whether such damages are payable under one or more coverages." According to Rohr, pursuant to this plain language, liability under the Royal primary policies "can be no more than $2 million for a single occurrence no matter how many years or how many policies of the [insurer] are implicated by the occurrence." In claiming that the policies make a distinction between aggregate and per occurrence limits, Rohr further relies on the language of the limit of liability provision providing that "[s]ubject to the limit of liability with respect to 'each occurrence', the limit of liability stated in the declarations as 'aggregate' is the total limit of the Company's liability with respect to all occurrences taking place *during any annual term* of this policy." (Emphasis added.) Because the policies include language demonstrating that the aggregate limit is annualized and omit such language as to the per occurrence limit, Rohr claims that it is clear from the policies that the per occurrence limits of $2 million cannot be annualized. In support of its claim that a single occurrence can take place over multiple years, Rohr relies on the definition of an occurrence as meaning "an event or continuous or repeated exposure to conditions" that causes injury or damage, and the limiting language that the exposure to substantially the same conditions arising from the same cause "shall be deemed one occurrence." Thus, Rohr alleges that the environmental contamination that occurred over the period of 1959 to 1971 covered by the policies constituted a single occurrence and resulted in coverage of $2 million for that one occurrence.[18] Finally, Rohr claims that the three year extension of each policy did not provide additional per occurrence limits and that,

"[e]ven if each of the two Royal [primary] policies provided separate per occurrence limits . . . then, at most, the two Royal policies provide a total of $4 million in per occurrence limits."

Contrary to Rohr's claims, the Continental plaintiffs claim that the Royal primary policies that were in effect from 1959 to 1971 have *annual* per occurrence limits of $2 million, for a total liability over the twelve years of $24 million. In support of their claim, the Continental plaintiffs rely primarily on the language of the three year policy period endorsements, which provide that "[t]he policy period stated in the declaration is comprised of three consecutive annual periods." According to the Continental plaintiffs, those endorsements demonstrate that the Royal primary policy periods "are to be treated as annual periods, each subject to a per occurrence limit," rather than "as a multiyear policy with a single per occurrence limit," and that "[t]he 'policy period' of each multiyear Royal primary policy is specifically defined by endorsement as 'three consecutive annual periods.' " (Emphasis omitted.) The Continental plaintiffs also rely on *Stonewall Ins. Co.* v. *Palos Verdes Estates*, 46 Cal. App. 4th 1810, 1849, 54 Cal. Rptr. 2d 176 (1996) (*Stonewall*), review denied, California Supreme Court, Docket No. S027319 (October 23, 1996), in support of their position.

1

Annualization

In order for this court to resolve the first issue raised on appeal, we must first determine whether the per occurrence limit of $2 million may be annualized pursuant to the terms of the policies. As stated previously, the interpretation of an insurance contract involves a question of law over which we must exercise de novo review. See *Chicago Title Ins. Co.* v. *Bristol Heights Associates, LLC*, supra, 142 Conn. App. 405; *Nationwide Mutual Ins. Co.* v. *Allen*, 83 Conn. App. 526, 537, 850 A.2d 1047, cert. denied, 271 Conn. 907, 859 A.2d 562 (2004).

"Words used in an insurance policy are to be interpreted according to the plain meaning which a layman would ordinarily attach to them. Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." *Reserve Ins. Co.* v. *Pisciotta*, 30 Cal. 3d 800, 807, 640 P.2d 764, 180 Cal. Rptr. 628 (1982); see also *Legacy Vulcan Corp.* v. *Superior Court*, supra, 185 Cal. App. 4th 688 ("We interpret words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage. . . . If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs." (Citation omitted.)). "In California, a contract must be interpreted 'to give effect to the mutual intention of the

parties as it existed at the time of contracting.' . . . If possible, the Court will infer that mutual intention solely from the plain language of the contract, read as a whole." (Citation omitted.) *Atain Specialty Ins. Co. v. Sierra Pacific Management Co.*, Docket No. 2:14-cv-00609 (TLN), 2016 WL 6568678, *2 (E.D. Cal. November 3, 2016), aff'd, 725 Fed. Appx. 557 (9th Cir. 2018).

In addressing this issue, the trial court agreed with Rohr that the aggregate limits and the per occurrence limits are treated differently in the policies. After setting forth the limit of liability provision of the policies, the court explained: "The first sentence of the clause defines the limits of what the policy will pay for one occurrence, whether the damages 'are payable under one or more coverages.' The insuring agreements define the three types of coverage provided under the policy: Coverage A (bodily injury), Coverage B (property damage), and Coverage C (malpractice). The plain meaning of this language is that if one occurrence results in more than one type of injury as defined under the available coverages, the policy limit for one occurrence is a total of $2 million for the combined injuries. The natural, unrestrained reading of the clause is that if one occurrence results in both bodily injury and property damage, the policy's limits do not provide coverage in the amount of $2 million for bodily injury and an additional $2 million for property damage. Instead, the combined bodily injury and property damage arising from that occurrence are subject to a limit of $2 million per occurrence.

"The second sentence under the limits of liability clause defines the policies' aggregate limits. The language provides that the aggregate limit is 'subject to' the per occurrence limit, and that the aggregate limit is the total amount of coverage that the policy will provide for all occurrences 'during any annual term.' The Royal policies do not define 'aggregate.' Accordingly, critical to construction of the policies' terms is the meaning of the word 'aggregate' as interpreted in its ordinary and popular sense. 'Aggregate,' as an adjective, is defined to mean 'formed by the collection of units or particles into a body, mass, or amount.' Merriam-Webster's Collegiate Dictionary (10th Ed. 2000). As a noun, 'aggregate' means 'the whole sum or amount: sum total.' . . . Id. Thus, the most natural reading of the clause is that, regardless of the number of occurrences causing injury within one annual term (one year) of the policy, the greatest amount of coverage that the policy will provide in that year is $2 million. Therefore, if one occurrence had already resulted in payment of $500,000 in claims, and a second occurrence within the annual term yields $2 million in claims, the greatest amount of coverage that the policy will provide for the second occurrence is $1.5 million." (Footnote omitted.)

The trial court found that the reference to " 'any

annual term'" only in the aggregate limit of liability clause demonstrated an intent of the parties to treat the aggregate and per occurrence limits differently. The court concluded that "a natural, unrestrained reading of the limits of liability clauses compels an interpretation that the first sentence sets a per occurrence limit for *the three year policy period*, while the second sentence establishes an aggregate limit for multiple occurrences during *any annual term*." (Emphasis in original.) Thus, the court concluded that the per occurrence limits could not be annualized.[19] We agree with that conclusion.

The plain language of the Royal primary policies referencing an annual term in the sentence defining the aggregate limit of liability in the declarations, while making no such reference to an annual time period in the sentence defining the limit of liability with respect to each occurrence as stated in the declarations, indicates a clear intent of the parties that the reference to "any annual term" applies to the aggregate limit only. See *Northrop Grumman Corp.* v. *Factory Mutual Ins. Co.*, 805 F. Supp. 2d 945, 952 (C.D. Cal. 2011) (failure of insurer to include limiting language in insurance contract with respect to certain peril, even though insurer had done so within same section for another peril, indicated intent of parties not to so limit coverage); see also *Fireman's Fund Ins. Cos.* v. *Atlantic Richfield Co.*, 94 Cal. App. 4th 842, 852, 115 Cal. Rptr. 2d 26 (2001) ("an insurance company's failure to use available language to exclude certain types of liability gives rise to the inference that the parties intended not to so limit coverage"). The policy period for each policy as set forth in the declarations is a three year period, and the language of each policy providing coverage of $2 million for each occurrence is not stated in terms of per occurrence, per year. The provisions are not ambiguous, and we must read them as written. See *Continental Ins. Co. II*, supra, 15 Cal. App. 5th 1031 ("[i]f contractual language is clear and explicit, it governs" (internal quotation marks omitted)); *Peerless Casualty Co.* v. *Continental Casualty Co.*, supra, 144 Cal. App. 2d 626 (insurance clause "will be given effect as written").

We are not persuaded by the claim of the Continental plaintiffs that "[t]he 'policy period' of each multiyear Royal primary policy is specifically defined by endorsement as 'three consecutive annual periods.'" (Emphasis omitted.) Each policy contains an endorsement titled, "Three Year Policy Period," which provides in part: "It is agreed that such insurance as is afforded by the policy applies subject to the following provision: (1) The policy period stated in the declaration is comprised of three consecutive annual periods." That endorsement does not define a policy period as three consecutive annual periods; rather, it states that the three year policy period is "*comprised*" of three annual periods. (Emphasis added.) Comprised is defined by Merriam-Webster's

Dictionary as "to be made up of . . . compose; constitute . . . ." Merriam-Webster's Collegiate Dictionary (10th Ed. 1998) p. 237. The endorsement simply states that the three year policy period is made up of three annual periods, which is relevant in that rates are based on annual periods, as further stated in the endorsement. Nowhere in the policies or the endorsements is the policy period defined as three consecutive annual periods, so that each year is a separate policy period, as alleged by the Continental plaintiffs.

Moreover, the reliance on *Stonewall*, supra, 46 Cal. App. 4th 1810, by the Continental plaintiffs is misplaced. The policy at issue in that case was for a three year period from November 1, 1975, to November 1, 1978. Id., 1849. The policy covered "liability for property damage with limits per [an attached endorsement]. There [were] three separate endorsements for the years 1975 through 1978, each including a limit of $300,000 per occurrence and in the aggregate and a deductible of $1,000 per claim. There [were] three separate [d]eclarations, each for a separate policy period." (Internal quotation marks omitted.) Id. The trial court in that case concluded that the subject policy "covered three separate periods with a limit of $300,000 for each period, an aggregate of $900,000 in coverage. [The insurer] argue[d] that its policy included one $300,000 limit applicable to the entire three-year period." Id. The California Court of Appeal agreed with the trial court, finding that the policy was ambiguous and that the ambiguity had to be construed against the insurer. Id. Moreover, the ambiguity was resolved against the insurer also on the basis of a stipulation it had entered into, which provided that " '[t]he subject policies of insurance issued by . . . [the insurer] . . . provided coverage of $300,000 per occurrence *per year* as respects property damage.' " (Emphasis added.) Id.

In the present case, each Royal primary policy contained one endorsement providing for a policy period of three years and setting the limit of coverage at $2 million per occurrence, which is factually different from the three separate endorsements at issue in *Stonewall*, each of which set forth a per occurrence limit of $300,000. Nor is there any language in the Royal primary policies or their declarations providing for coverage on a per occurrence, per year basis. We, therefore, conclude that *Stonewall* is distinguishable from the present case. Accordingly, the per occurrence language of each Royal primary policy provides coverage of up to $2 million for an occurrence that takes place during the policy period and not for each year of that policy period.

2

Policy Extensions

Having determined that the per occurrence limits of

the Royal primary policies may not be annualized under the terms of those policies, we next address Rohr's claim that the extensions of the two Royal primary policies did not result in additional per occurrence limits. We agree.

Rohr's claim is based on its assertion that the endorsements did not create new stand-alone policies but, rather, simply extended the policy period for each policy. Thus, Rohr claims, "[a]t most, the two Royal policies together provide a total of $4 million in per occurrence limits," and that because Arrowood, as successor to Royal, paid more than $4 million in settling with Rohr, the policies were exhausted and, thus, the trial court improperly rendered summary judgment in favor of the Continental plaintiffs on this issue. Rohr relies on *A.B.S. Clothing Collection, Inc.* v. *Home Ins. Co.*, 34 Cal. App. 4th 1470, 41 Cal. Rptr. 2d 166 (1995) (*A.B.S. Clothing*), review denied, California Supreme Court, Docket No. S047360 (August 10, 1995), in support of its claim. That case involved a breach of contract action by a policyholder against its insurance company and concerned the following issue: "When an employee embezzles funds from an employer over a period of years during which the employer carries insurance against employee dishonesty from the same insurer, may the employer recover up to the insurer's limit of liability for each year in which the embezzlement occurs?" Id., 1473. The insurer had "issued a separate policy document each year. Each policy was effective for a specified 'policy period' [of one year]. The second policy stated it was a 'renewal' of the first; the third stated it was a 'renewal' of the second." Id., 1483. Rohr points to the fact that, in finding that the parties had entered into separate, independent contracts, the court in *A.B.S. Clothing* "considered that the insure[d] [had] issued three separate policies, each with different policy numbers and policy periods, notwithstanding that the second and third policies were identified as 'renewals.'" Thus, Rohr asserts that because those circumstances are different from those in the present case, the extensions here merely constituted continuations of the original contracts.

The Continental plaintiffs disagree with Rohr's contention that the two policy extensions did not constitute separate contracts with separate policy limits. Instead, they claim that because endorsements to the Royal primary policies state that the policy period " 'is comprised of three consecutive annual periods,' " each three year policy and each three year extension, at a minimum, "constitute separate policy periods, totaling four policy periods." The Continental plaintiffs cite *A.B.S. Clothing*, supra, 34 Cal. App. 4th 1476, for the proposition that, "[w]here indemnity is afforded through separate and distinct contracts for specific policy periods the insurer is generally held liable up to its limit of liability for each policy period." Furthermore, to sup-

port their claim that the policy extensions for each policy do not constitute one continuous contract, they claim that *A.B.S. Clothing* left open one situation in which an extension does not constitute a new policy with a new contract period, namely, "where the terms of the contract, taken as a whole, establish *an intention the policy be continued indefinitely* . . . ."[20] (Emphasis added.) Id.

We first examine the general rules governing insurance contract renewals or extensions, and the decision in *A.B.S. Clothing* before addressing the merits of the parties' claims. "Renewal or to renew means the issuance and delivery by an insurer of a policy replacing at the end of the policy period a policy previously issued and delivered by the same insurer, or the issuance and delivery of a certificate or notice extending the term of a policy beyond its policy period or term . . . ." (Internal quotation marks omitted.) *Borders* v. *Great Falls Yosemite Ins. Co.*, 72 Cal. App. 3d 86, 93, 140 Cal. Rptr. 33 (1977). "The renewal of insurance contracts may raise many questions, including whether there is a right to renew, whether nonrenewal has been effected in accordance with the terms of all relevant policy and statutory provisions, and whether a renewal, once effected, is to be regarded as a continuation or extension of the original policy or as a new policy or contract of insurance. An accurate definition of renewal cannot be made until it is first determined whether the renewal takes effect as an extension or continuation of the original policy or whether it represents the formation of a new, although identical, contract of insurance." 2 S. Plitt et al., Couch on Insurance (3d Ed. Rev. 2010) § 29:1, p. 29-4. Moreover, "[w]hether the renewal of a policy constitutes a new and independent contract or continuation of the original contract primarily depends upon the intention of the parties as ascertained from the instrument itself. In the absence of any contrary statutory provision, the parties may effectively designate that the renewal policy shall be regarded as a continuation of the policy or that it shall not be so regarded. Accordingly, it has been held that the rule that a renewal policy constitutes a separate and distinct contract for the period of time covered by the renewal does not apply where the extension agreement shows a contrary intention as by stipulating that the original agreement '*continues in force*.' " (Emphasis added; footnotes omitted.) Id., § 29:33, p. 29-65. "In the absence of a clear provision in the policy defining the nature of the renewal, some courts regard the renewed or renewal contract as though it were merely a continuation or extension of the original contract. By this view, the renewal of a policy continues it in force without interruption, and the renewal certificate is simply a contract to continue in force a preexisting policy of insurance." (Footnotes omitted.) Id., § 29:35, p. 29-68.

In California, "[t]he renewal of an insurance policy

constitutes a separate and distinct contract for the period of time covered by the renewal and is not a continuous contract 'unless there is clear and unambiguous language showing the parties intended to enter into one continuous contract.' " *Charles Dunn Co.* v. *Tudor Ins. Co.*, 308 Fed. Appx. 149, 151 (9th Cir. 2009), quoting *A.B.S. Clothing*, supra, 34 Cal. App. 4th 1478. In *Charles Dunn Co.*, the United States Court of Appeals for the Ninth Circuit found the existence of separate and distinct contracts where the insurance company "issued separate policy documents for each renewal policy and each renewal policy identified a separate policy period." Id. In *A.B.S. Clothing*, the California Court of Appeal found that the policies at issue in that case did not contain clear and unambiguous language demonstrating an intent of the parties to enter into one continuous contract. *A.B.S. Clothing*, supra, 1478. In reaching that conclusion, the court first explained that the issue before it was one of first impression in California and that "[c]ourts in other jurisdictions have generally held if coverage is based on a series of separate, independent contracts, then the [insured] is entitled to recover up to the limit of liability for each policy period in which a loss occurs. On the other hand, if there is but one continuous contract, then the [insured's] recovery cannot exceed the limit of liability stated in the contract regardless of the number of years the coverage has been in force, the number of policies issued or the number of premiums the [insured] has paid." Id., 1473–74. The court further explained: "Over the years, the rule has developed that a renewal of a fidelity policy or bond constitutes a separate and distinct contract for the period of time covered by such renewal unless it appears to be the intention of the parties as evidenced by the provisions thereof that such policy or bond and the renewal thereof shall constitute one continuous contract." (Internal quotation marks omitted.) Id., 1476. Because the insurer had issued separate policy documents, the court examined the provisions of the policies, finding that certain provisions were ambiguous and did not demonstrate a clear and unambiguous intent of the parties to enter into one continuous contract. Id., 1480–83. In particular, the court found that "[t]he issuance of separate policy documents, each of which refers to terms, conditions and losses under that particular policy, is strong evidence the original policy and the subsequent renewal policies were intended to be separate and distinct contracts." Id., 1484.

With this backdrop in mind, the question that we must answer is whether it is clear from the language of the policy renewal certificate and endorsement that the parties intended to enter into one continuous contract. With respect to Royal primary policy RLP 144014, the record contains a "Renewal Certificate" dated August 1, 1962. The certificate includes the same policy number, "RLP 144014," and indicates the name of the

insured as Rohr and the name of the insurer as "Royal Indemnity [Company]." It provides as follows: "It is hereby understood and agreed that the *term* of [the] above policy is extended for a period of three years.

"August 1, 1962 to August 1, 1965

"It is further agreed that all coverages now provided by the policy, with same insuring agreements, conditions, exclusions and provisions of retrospective premium endorsement, *continue in full force and effect*." (Emphasis added.) The certificate also contains the following provision: "This endorsement is issued for attachment to and is hereby made a part of the policy designated above, and is effective as of the date indicated . . . ."

We conclude from the language used in the August 1, 1962 renewal certificate that the parties intended for the extension to be a part of one continuous contract. First, the renewal certificate contains the same policy number as the original policy, and no new policy document was issued; the parties simply executed the renewal certificate. The clear language of the renewal certificate states that the "term" of Royal policy RLP 144014 is being "extended for a period of three years." Moreover, the language that all coverages already provided by policy RLP 144014 "continue in full force and effect" is indicative of an intent to continue in force the preexisting policy of insurance. See 2 S. Plitt et al., supra, § 29:33, p. 29-65 ("it has been held that the rule that a renewal policy constitutes a separate and distinct contract for the period of time covered by the renewal *does not apply* where the extension agreement shows a contrary intention as by stipulating that the original agreement '*continues in force*' " (emphasis added)); see also *Grand Lodge of United Bros. of Friendship & Sisters of Mysterious Ten* v. *Massachusetts Bonding & Ins. Co.*, 324 Mo. 938, 952, 25 S.W.2d 783 (1930) ("[t]he words 'continue in force' as used in the continuation certificate clearly indicate that it was the intention of the parties to extend the duration or term of the original bond and not to make a new contract"). The word continue is defined to mean "to maintain without interruption a condition, course, or action . . . to remain in existence . . . ." Merriam-Webster's Collegiate Dictionary (10th Ed. 1998) p. 251. An unrestrained reading of the language of the renewal certificate supports a conclusion that Royal primary policy RLP 144014, which was in effect from August 1, 1959, to August 1, 1962, was merely extended to cover the period from August 1, 1962, to August 1, 1965, and that the renewal constituted a continuation of the existing policy. It follows, therefore, that the insurer's liability cannot exceed that which is stated in the limit of liability of the policy—$2 million—regardless of the number of years the coverage has been in force.

With respect to Royal primary policy RTS 902235,

which was in effect from August 1, 1965, to August 1, 1968, the record contains an endorsement that identifies the same policy number, the name of the insured as Rohr and the name of the insurer as Royal Indemnity Company. The endorsement contains the following provision: "This endorsement is issued for attachment to and is hereby made a part of the policy designated above, and is effective as of the date indicated . . . ." The endorsement provides: "It is agreed that the policy is extended for a second three year term effective August 1, 1968 to August 1, 1971 and that the deposit is increased from $4,000.00 to $6,500.00. It is further agreed that for the term from August 1, 1968 to August 1, 1969 the earned premium under this policy for coverage A, B and C will be determined on the basis of the following rates . . . ." Although the language of the endorsement differs slightly from that of the renewal certificate for policy RLP 144014, in that the endorsement states that the "*policy* is extended for a second three year term"; (emphasis added); whereas the renewal certificate for policy RLP 144014 states that "the *term* of [the] above policy is extended for a period of three years"; (emphasis added); the end result is the same in both circumstances: each policy was extended for a three year period. See 2 A. Windt, Insurance Claims & Disputes (6th Ed. 2013) § 6:48 ("If extra years of coverage are added to a policy, the insured will not be entitled to a separate policy limit for each year (unless the policy provides for a separate per year limit). If the endorsement that provides extra years of coverage states that the policy term is being 'extended,' there is still only one policy, not a new policy, for the years added.").

As with policy RLP 144014, the extension of policy RTS 902235 carries the same policy number, and no separate policy document was executed, which has been found to be indicative of an intent to have one continuous contract, rather than separate contracts. Cf. *A.B.S. Clothing*, supra, 34 Cal. App. 4th 1474, 1484; see also *Charles Dunn Co*. v. *Tudor Ins. Co*., supra, 308 Fed. Appx. 151. Furthermore, the endorsement itself states that it was "attach[ed] to" and "made a part of" the original policy, RTS 902235. Finally, and perhaps most telling of an intent for the policy extensions to be part of one continuous contract, rather than new separate, independent contracts, is the fact that Royal issued policy RLP 144014 in 1959 for an initial three year period, which was extended to provide coverage through August 1, 1965, when Royal issued policy RTS 902235. The fact that Royal issued a new separate policy, with a different policy number, in 1965, whereas it had previously executed a renewal certificate extending the policy period for the policy that previously had been in place, further supports a determination that the renewal certificate to policy RLP 144014 and the endorsement to policy RTS 902235 merely extended

and continued those policies and did not create new, separate contracts with separate policy limits.

In the present case, the trial court concluded that, because "the policies unambiguously provide a per occurrence limit that applies per policy period . . . the Royal policies were in force for a total of four consecutive policy periods, each providing $2 million in coverage per occurrence for a total of $8 million per occurrence for the years that the Royal policies were in force." In light of our review of the relevant law on this issue, as well as the language of the renewal certificate and the endorsement themselves, we cannot agree with the trial court's conclusion. We conclude that the renewal and endorsement constituted continuations of the original contracts; accordingly, the limit of the insurer's liability is "the amount stated in the contract regardless of the number of years involved or number of premiums paid." *A.B.S. Clothing*, supra, 34 Cal. App. 4th 1476. Because the per occurrence limit of liability in each policy is $2 million, Rohr is entitled to coverage in the amount of $2 million per policy, for a total of $4 million, as we more fully discuss in the next part of this opinion.

B

Horizontal Exhaustion of Primary Policies

Rohr next claims that the trial court erred in determining that the underlying primary policies must be horizontally exhausted before liability under the excess policies may attach. In light of our determination that the $2 million per occurrence limit of liability in the Royal primary policies cannot be annualized and that the extensions of the two Royal primary policies did not result in additional per occurrence limits, the limit of liability for each of the Royal primary policies, which provide that an occurrence is "an event or continuous or repeated exposure to conditions which unexpectedly cause injury or damage during the policy period," is $2 million. Thus, regardless of whether this court finds that vertical or horizontal exhaustion must be applied, at most, Rohr must exhaust $4 million of the 1959–1971 Royal primary insurance coverage before it can access certain of its excess policies. Because Rohr settled with Arrowood with respect to those Royal primary policies for an amount that exceeded $4 million, Rohr can meet its exhaustion requirement for certain of its excess policies under either a vertical or horizontal exhaustion application.

This court, nevertheless, must address the exhaustion claims for the following reasons. First, this case involves a number of different policies with different exhaustion requirements, in that one of the Harbor excess policies is an umbrella policy, which has different provisions governing its applicability, some of the policies are first layer excess policies and some, like

certain of the Federal and Century policies, are second layer excess policies, to which different exhaustion rules may apply. Thus, although Rohr may meet the exhaustion requirement of some of the excess policies regardless of whether a rule of vertical or horizontal exhaustion applies, a determination of which rule applies will have an effect on whether or when it can meet the exhaustion requirements of certain of the other policies. Second, the first phase of this litigation before the trial court concerned the following question: "At what point will the obligations of the excess insurers, if any, arise in light of the limits of the underlying primary policy or policies?" For this court to determine whether the trial court properly answered that question for certain of the excess policies, we must first determine whether vertical or horizontal exhaustion applies. Finally, under California law, each policy must be interpreted according to its terms. See *Continental Ins. Co. I*, supra, 55 Cal. 4th 195 (fundamental goal of insurance contract interpretation is to give effect to mutual intent of parties, which should be inferred, if possible, solely from written provisions of contract). Because of the variation in the types of policies involved in these appeals, as well as their exhaustion requirements, we must examine the rules and case law governing vertical and horizontal exhaustion and address whether the trial court's determination that a horizontal exhaustion requirement applied here was proper.

Before we address the merits of this claim, we first set forth our standard of review and the applicable law on this issue. Because this claim concerns the interpretation of an insurance contract, it involves a question of law over which we must exercise de novo review. See *Chicago Title Ins. Co.* v. *Bristol Heights Associates, LLC*, supra, 142 Conn. App. 405; *Nationwide Mutual Ins. Co.* v. *Allen*, supra, 83 Conn. App. 537. As this court previously discussed, California courts apply the continuous injury trigger of coverage and the all sums plus stacking rules to long-tail environmental injury claims like the one in the present case. *Continental Ins. Co. I*, supra, 55 Cal. 4th 191, 201–202. Under those rules, an insurer that is liable when continuous or progressively deteriorating property damage occurs throughout several policy periods is obligated to pay the insured all sums for the property damage, up to the policy limits, "as long as some of the continuous property damage occurred while each policy was 'on the loss' "; id., 200; and when the ongoing environmental damage triggers multiple policies across many policy years, the insurance coverage from several policy periods may be stacked "to form one giant 'uber-policy' with a coverage limit equal to the sum of all purchased insurance policies. Instead of treating a long-tail injury as though it occurred in one policy period, this approach treats all the triggered insurance as though it were purchased in one policy period." Id., 201.

First, we examine and determine the applicability of certain recent California case law on which the parties rely in making their claims for and against a rule of horizontal exhaustion.

### 1

### *Montrose II* and *Montrose III* Decisions

In *Montrose Chemical Corp. of California* v. *Superior Court*, 14 Cal. App. 5th 1306, 1312, 222 Cal. Rptr. 3d 748 (2017) (*Montrose II*), rev'd, 9 Cal. 5th 215, 460 P.3d 1201, 260 Cal. Rptr. 3d 822 (2020), Montrose Chemical brought a declaratory judgment action seeking a determination regarding the sequence in which it could access its excess general comprehensive liability policies to cover its liability for certain environmental injuries caused by its manufacturing of a pesticide. Specifically, Montrose Chemical sought a judgment declaring that "it may 'electively stack' excess policies—i.e., that it may access any excess policy issued in any policy year so long as the lower lying policies for the same policy year have been exhausted." (Emphasis omitted.) Id. The insurers in that case alleged that "well-established California law and the language of the relevant policies required Montrose [Chemical] to 'exhaust coverage from *all* underlying insurers in each of the triggered policy periods, such that higher-level excess insurers' obligations are triggered only when all primary and lower-level excess policies have been exhausted.' " (Emphasis in original.) Id., 1316–17. The trial court in that case had concluded that, under the stacking approach endorsed by the California Supreme Court in *Continental Ins. Co. I*, supra, 55 Cal. 4th 186, "the aggregate value of all underlying policies throughout the duration of a continuous loss must be exhausted before excess coverage is accessible to the insured"; (internal quotation marks omitted) *Montrose II*, supra, 1319; and that "the parties must employ a horizontal exhaustion approach, whereby the aggregate limits of underlying policies for the applicable policy periods must first be exhausted before any excess policies incur a duty to indemnify Montrose [Chemical] for its liabilities . . . ." (Internal quotation marks omitted.) Id., 1320.

On appeal in *Montrose II*, the California Court of Appeal reversed in part the judgment of the trial court. Although the Court of Appeal agreed with the trial court that Montrose Chemical could not electively stack policies for a single coverage year and vertically exhaust policies for that single year once the underlying policy had been exhausted; id., 1321; it concluded that the excess policies do not need to "be horizontally exhausted at *each* coverage level and for *each* year before higher-level policies may be accessed. Instead . . . the sequence in which policies may be accessed must be decided on a policy-by-policy basis, taking into

account the relevant provisions of each policy." (Emphasis in original.) Id., 1312. Specifically, the court explained that, "because there is tremendous variation among the policies at issue, [it] decline[d] to adopt a single exhaustion scheme that applie[d] to [Montrose Chemical's] entire coverage portfolio, and instead direct[ed] that each policy be interpreted according to its terms." Id., 1321.

After the parties presented oral argument in the present case, on April 6, 2020, the California Supreme Court issued its decision in *Montrose Chemical Corp. of California* v. *Superior Court*, 9 Cal. 5th 215, 460 P.3d 1201, 260 Cal. Rptr. 3d 822 (2020) (*Montrose III*).[21] In *Montrose III*, the California Supreme Court reversed the judgment of the Court of Appeal in *Montrose II* and concluded that "California law permits Montrose [Chemical] to seek indemnification under any excess policy once Montrose [Chemical] has exhausted the underlying excess policies in the same policy period. Montrose [Chemical] [was] not required to exhaust excess insurance at lower levels for all periods triggered by continuous injury before obtaining coverage from higher level excess insurance in any period." Id., 238.

We must examine the basis for the court's decision in *Montrose III* before we can determine how that decision applies, if at all, to the present case. The California Supreme Court explained that the issue before it concerned the sequence in which Montrose Chemical could access certain excess insurance policies covering the period from 1961 to 1985, during which Montrose Chemical had obtained primary insurance and multiple layers of excess insurance. Id., 222. The court noted that the parties in that case were in agreement that the dispute did not concern the exhaustion of Montrose Chemical's primary insurance. Id., 223. The language of each policy at issue provided that Montrose Chemical was required to exhaust the limits of its underlying insurance coverage before it could obtain coverage under the policy; id.; and the excess policies also provided, in a number of ways, that " 'other insurance' must be exhausted before the excess policy can be accessed." Id., 224. The parties' disagreement concerned whether the other insurance clauses required the exhaustion of other insurance from other policy periods. Id., 225. Montrose Chemical proposed a rule of " 'vertical exhaustion' or 'elective stacking,' whereby it [could] access any excess policy once it has exhausted other policies with lower attachment points in the same policy period." Id. In contrast, the insurers argued for a rule of horizontal exhaustion whereby an excess policy could be accessed only after Montrose Chemical exhausted "other policies with lower attachment points from *every* policy period in which the environmental damage resulting in liability occurred." (Emphasis in original.) Id.

The California Supreme Court granted the petition for

review in *Montrose III* "to determine whether vertical exhaustion or horizontal exhaustion is required when continuous injury occurs over the course of multiple policy periods for which an insured purchased multiple layers of excess insurance"; id., 226; and concluded that "a rule of vertical exhaustion is appropriate." Id. In explaining the basis for its decision, the court stated: "The parties' dispute centers on the meaning of the 'other insurance' clauses in the excess insurance policies. These clauses provide, in a variety of ways, that each policy shall be excess to other insurance available to the insured, whether or not the other insurance is specifically listed in the policy's schedule of underlying insurance. The insurers argue that these clauses call for a rule of horizontal exhaustion because they restrict indemnification from any excess policy until the insured has exhausted all other available insurance—which, in a case of long-tail injury, means every policy with a lower attachment point from every policy period triggered by the continuous injury.

"Although the insurers' interpretation is not an unreasonable one, it is not the only possible interpretation of the policy language. The 'other insurance' clauses at issue clearly require exhaustion of underlying insurance, but none clearly or explicitly states that Montrose [Chemical] must exhaust insurance with lower attachment points *purchased for different policy periods*." (Emphasis in original; footnote omitted.) Id., 230. The court concluded that the other insurance clauses did "not clearly specify whether a rule of horizontal or vertical exhaustion applie[d]" and that, "in the absence of any more persuasive indication that the parties intended otherwise, the policies are most naturally read to mean that Montrose [Chemical] may access its excess insurance whenever it has exhausted the other directly underlying excess insurance policies that were purchased for the same policy period." Id., 234. The court further explained that "[a] rule of vertical exhaustion does not restrict the insured from accessing excess coverage from other policy periods if the terms and conditions are otherwise met; it merely relieves the insured of the obligation of establishing whether *all* of the applicable terms and conditions at any given 'layer' of excess coverage are met before it accesses the next 'layer' of coverage." (Emphasis in original.) Id., 235–36.

In its decision, the California Supreme Court noted the parties' reliance on *Community Redevelopment Agency* v. *Aetna Casualty & Surety Co.*, supra, 50 Cal. App. 4th 329, but found that case to be distinguishable for reasons that are important to the present case. *Montrose III*, supra, 9 Cal. 5th 237. The court in *Montrose III* explained: "In *Community Redevelopment* [*Agency*], a primary insurer sought contribution from an excess insurer for defense costs on behalf of the insured in a case involving continuous loss. To resolve the conflict, the court applied what it termed a 'horizontal exhaus-

tion rule'; under that rule, the court held, an excess insurer in a continuous injury case is not required 'to "drop down" and provide a defense to a common insured before the liability limits of *all* primary insurers on the risk have been exhausted.' . . . In adopting that rule, the court explained: 'Absent a provision in the excess policy *specifically describing* and *limiting* the underlying insurance, a horizontal exhaustion rule should be applied in continuous loss cases because it is most consistent with the principles enunciated in *Montrose* [*I*, supra, 10 Cal. 4th 645]. . . . Under the principle of horizontal exhaustion, *all* of the primary policies must exhaust before *any* excess will have coverage exposure.' . . .

"This case differs from *Community Redevelopment* [*Agency*] in fundamental respects. This case, unlike *Community Redevelopment* [*Agency*], is not a contribution action between primary and excess insurers; it is, rather, a coverage dispute between excess insurers and their insured. Regardless of whether *Community Redevelopment* [*Agency*] was correct to apply a rule of horizontal exhaustion in that distinct context—a question not presently before us—we are unpersuaded that the reasoning of *Montrose I* requires us to apply a rule of horizontal exhaustion that would limit [Montrose Chemical's] ability to access the excess insurance coverage it has paid for." (Citations omitted; emphasis in original.) *Montrose III*, supra, 9 Cal. 5th 237. In fact, the court in *Montrose III* specifically stated that, "[b]ecause the question is not presented here, we do not decide when or whether an insured may access excess policies before all primary insurance covering all relevant policy periods has been exhausted." Id., 226 n.4.

Following the release of the decision in *Montrose III*, this court ordered the parties in the present case to file simultaneous supplemental briefs to address the impact, if any, of *Montrose III* on the issues in the pending appeals. In its supplemental brief, Rohr asserts that, pursuant to *Montrose III*, the trial court's decision must be reversed. Although Rohr acknowledges that *Montrose III* involved circumstances different from those in the present case, in that the parties in *Montrose III* stipulated that all of the primary insurance had been exhausted and the issue in that case concerned whether vertical or horizontal exhaustion applied to layers of excess policies, Rohr claims that "the 'all sums' principles enunciated [in] *Montrose III* necessarily lead to the same result here: vertical exhaustion of directly underlying policies is all that is required for Rohr to access its excess policies." Rohr further claims that its policies contain the "all sums" language and that "there is no reason to distinguish primary policies from excess policies based on [that] language"; the reasonable expectations of the parties are best satisfied by a rule of vertical exhaustion; to the extent that "other insurance" provisions existed, there is no clear or explicit policy

language that requires the exhaustion of all underlying insurance, including primary insurance, regardless of the policy period, nor is there any indication in the construction of other insurance provisions in *Montrose III* suggesting that a different exhaustion rule applies for primary policies; and *Community Redevelopment Agency* is distinguishable because it involved a dispute between insurers, whereas the present case involves a dispute between an insured and its insurers.

In their supplemental brief, in contrast, the Continental plaintiffs raise a number of arguments essentially asserting that *Montrose III* has no impact on our resolution of the issues in the present case. Specifically, the Continental plaintiffs claim that because *Montrose III* addressed only the sequence in which an insured may access its excess policies where all primary insurance had been exhausted, and because it did not address or change the rule that all primary insurance must be exhausted before the obligations of an insurer under a general excess policy are triggered, it was neither binding nor persuasive authority and has no impact on the issues before this court. They claim, therefore, that this court should follow decisions of the California Courts of Appeal that universally require horizontal exhaustion of primary policies before liability of an excess insurer attaches. We agree with the Continental plaintiffs.

The court in *Montrose III* specifically stated that it was not addressing the issue decided in *Community Redevelopment Agency*, which is similar to the issue presently before this court—whether a horizontal exhaustion rule requiring the exhaustion of all primary policies before any excess insurance will attach should be applied in continuous loss cases; *Montrose III*, supra, 9 Cal. 5th 237; and that it was not deciding "when or whether an insured may access excess policies before all primary insurance covering all relevant policy periods has been exhausted." Id., 226 n.4. The parties in *Montrose III* having stipulated that all primary insurance had been exhausted, the dispute in that case concerned the sequence in which certain excess policies could be accessed, specifically, "whether vertical exhaustion or horizontal exhaustion is required when continuous injury occurs over the course of multiple policy periods for which an insured purchased multiple layers of excess insurance." Id., 226. Thus, the court's application of a rule of vertical exhaustion under those circumstances has no bearing on our determination of the issue in the present case of whether the trial court erred in determining that the underlying primary policies had to be horizontally exhausted before liability under the excess policies could attach.

*SantaFe Braun* Decision

On July 13, 2020, the California Court of Appeal for

the First District issued its decision in *SantaFe Braun, Inc.* v. *Ins. Co. of North America*, 52 Cal. App. 5th 19, 265 Cal. Rptr. 3d 692 (2020) (*SantaFe Braun*), review denied, California Supreme Court, Docket No. S264060 (September 30, 2020). That case involved a declaratory judgment action brought by an insured against its insurers in which the insured sought to obtain coverage for asbestos related claims under various excess liability insurance policies. Id., 21. The trial court rendered judgment in favor of the defendant excess insurers after determining that SantaFe Braun, Inc. (Braun), had failed to establish exhaustion of primary and certain layers of underlying excess insurance. Id. Braun claimed on appeal that the trial court improperly determined that the insurance policies at issue required the exhaustion of all layers of underlying insurance, namely, horizontal exhaustion, instead of requiring vertical exhaustion of only those policies specified in each excess policy. Id. During the pendency of the appeal in *SantaFe Braun*, the California Supreme Court decided *Montrose III*. In *SantaFe Braun*, the Court of Appeal for the First District agreed with Braun, concluding that, on the basis of "the reasoning in *Montrose III* . . . the trial court erred in interpreting the policies at issue in this case to require horizontal exhaustion of all primary and underlying excess insurance coverage before accessing coverage under the excess policies at issue." Id., 22.

On July 16, 2020, Rohr filed a notice with this court of supplemental authority pursuant to Practice Book § 67-10, directing this court's attention to the decision in *SantaFe Braun*, claiming that it was relevant to the arguments raised by Rohr on appeal. Thereafter, on July 23, 2020, this court issued an order requiring "the parties [to] file supplemental briefs of no more than [ten] pages on or before August 7, 2020, to discuss the impact, if any, of the opinion in [*SantaFe Braun*] on previous holdings of the California Courts of Appeal, including, but not limited to, that in *Community Redevelopment Agency* v. *Aetna Casualty & Surety Co.*, [supra, 50 Cal. App. 4th 342] and [*Continental Ins. Co. II*, supra, 15 Cal. App. 5th 1034] ('It is settled under California law that an excess or secondary policy does not cover a loss, nor does any duty to defend the insured arise, until all of the primary insurance has been exhausted. . . . Under the principle of horizontal exhaustion, all of the primary policies must exhaust before any excess will have coverage exposure.' (Emphasis omitted.)); and on *Olympic Ins. Co.* v. *Employers Surplus Lines Ins. Co.*, [supra, 126 Cal. App. 3d 600] (the principle that a secondary policy 'does not apply to cover a loss until the underlying primary insurance has been exhausted . . . holds true even where there is more underlying primary insurance than contemplated by the terms of the secondary policy')."

Before we address the arguments raised in the par-

ties' supplemental briefs, we must first set forth the basis for the court's decision in *SantaFe Braun.* At the outset, the court in *SantaFe Braun* acknowledged that the decision in *Montrose III* left unanswered the question that was before the court in *SantaFe Braun*, namely, "when the insured has incurred continuous losses extending over the coverage periods in multiple primary policies, whether all primary insurance covering all time periods must be exhausted ('horizontally') before the first level excess policies are triggered, or, as Braun contends, whether coverage under the excess policies is triggered once the directly underlying primary policies specified in each excess policy is exhausted ('vertically')." *SantaFe Braun*, supra, 52 Cal. App. 5th 27. Nevertheless, the court based its decision on the holding in *Montrose III*, stating: "Interpreting the provisions of the excess policies to mean what the Supreme Court in *Montrose III* held they mean will, in the absence of explicit language to the contrary, require the excess carriers to assume responsibility for defense and indemnity once the directly underlying primary policies have been exhausted. Whatever the rights of the excess carriers may be to contribution from primary insurers whose policies do not directly underlie the excess policy is a different question that is not now before us, and on which we express no opinion. We hold simply that (absent an explicit policy provision to the contrary) the insured becomes entitled to the coverage it purchased from the excess carriers once the primary policies specified in the excess policy have been exhausted." Id., 29.

After noting the argument of the excess carriers concerning the differences between primary and excess policies, the court in *SantaFe Braun* rejected the argument that such differences compel a conclusion that horizontal exhaustion of primary coverage is required before excess coverage is triggered. Id., 28–29. The court stated that "the differences between primary and excess coverage hold true whether vertical or horizontal exhaustion applies" and that they provide "little justification for construing the policy language interpreted in *Montrose III* differently simply because primary coverage purchased often many years later for other policy periods remains outstanding." Id., 28. The court in *SantaFe Braun* further stated: "Prior to the Supreme Court's decision in *Montrose III*, some appellate courts concluded that in a continuing loss situation, an excess insurer has no obligation 'to "drop down" and provide a defense to a common insured before the liability limits of *all* primary insurers on the risk have been exhausted.' . . . *Community Redevelopment Agency* v. *Aetna Casualty & Surety Co.* [supra, 50 Cal. App. 4th 332]; see also *Padilla* [*Construction*] *Co.* v. *Transportation Ins. Co.* [supra, 150 Cal. App. 4th 986] ['California's rule of "horizontal exhaustion" in liability insurance law requires all primary insurance to be exhausted before an

excess insurer must "drop down" to defend an insured, including in cases of continuing loss.'] . . . These cases, however, rely on an interpretation of policy language rejected by the [California] Supreme Court in *Montrose III*. . . . While those cases hold, for example, that 'other insurance' clauses preclude attachment of coverage until there has been horizontal exhaustion, *Montrose III* holds otherwise. Moreover, insofar as *Community Redevelopment* [*Agency*] . . . addresses the relative obligations as between the various insurers, and not the excess insurer's obligations to the insured, it is distinguishable. While . . . *Padilla* [*Construction Co.*] . . . involved an action by an insured seeking declaratory relief against its excess insurer, the court's extension of *Community Redevelopment* [*Agency*] can no longer be justified after *Montrose III*." (Citations omitted; emphasis in original.) *SantaFe Braun*, supra, 52 Cal. App. 5th 30.

In its second supplemental brief, Rohr claims that the decision in *SantaFe Braun* "squarely addresses the dispute over the exhaustion of primary policies raised in this appeal . . . ." Specifically, Rohr claims that the language of the policies at issue in *SantaFe Braun* is nearly identical to that of the policies at issue in the present case, that prior rulings of the Courts of Appeal in California in *Community Redevelopment Agency* and *Olympic Ins. Co.* are distinguishable because they concerned claims between insurers, which Rohr alleges have no relevance to direct claims between policyholders and their excess insurers, and that the differences between primary and excess insurance do not justify a horizontal exhaustion approach. Rohr further alleges that, "in policyholder claims for coverage for long-tail claims, California courts have consistently focused on the construction of policy language rather than equitable principles, and that distinction is critical in determining the type of exhaustion to be applied." Finally, Rohr alleges that *Padilla Construction Co.* is no longer good law in light of *SantaFe Braun*.

In contrast, the Continental plaintiffs, along with Federal and Century, claim in their joint supplemental brief that the decision in *SantaFe Braun*, a decision of the Fourth Division of the First District Court of Appeal, has no impact on the decisions by equal sister districts or divisions of the California Courts of Appeal in *Community Redevelopment Agency* v. *Aetna Casualty & Surety Co.*, supra, 50 Cal. App. 4th 329 (Third Division of Second District Court of Appeal), *Padilla Construction Co.* v. *Transportation Ins. Co.*, supra, 150 Cal. App. 4th 984 (Third Division of Fourth District Court of Appeal), *Continental Ins. Co. II*, supra, 15 Cal. App. 5th 1017 (Second Division of Fourth District Court of Appeal), and *Olympic Ins. Co.* v. *Employers Surplus Lines Ins. Co.*, supra, 126 Cal. App. 3d 593 (Third Division of First District Court of Appeal). They point out that it is the sole decision "by a division or district appellate court

within California to reject long-standing California jurisprudence holding that all general primary policies must first be exhausted before any excess policy may cover the loss." Specifically, they claim that *SantaFe Braun* "created a singularly minority rule inconsistent with over forty years of California law and contrary to the previous decisions of its sister California Court of Appeal districts and divisions," and that, "[u]nder California procedural rules, *SantaFe Braun* is not binding on any other California court [because] 'a decision by one court of appeal is not binding on other courts of appeal. Thus, one district or division within a district can refuse to follow a prior decision by a different district or division.' Precedential Effect of Appellate Court Opinions, Cal. Prac. Guide Civ. App. & Writs Ch. 14-D; *McCallum* v. *McCallum*, 190 Cal. App. 3d 308, 315 n.4, 235 Cal. Rptr. 396 (1987)." Citing *McCallum* v. *McCallum*, supra, 315 n.4, for the proposition that a decision by one division does not overturn a separate division's decision, they further allege that *Olympic Ins. Co.*, a decision by the Third Division of the First District, is also not impacted by *SantaFe Braun*. Finally, they claim that *Montrose III* should not be applied beyond its clear and specific holding, which did not address the issue presented in the present case involving the exhaustion of primary insurance, and that *SantaFe Braun* does not apply because the court in that case did not analyze the interaction between standalone other insurance provisions and ultimate net loss provisions in the excess policies, which they claim require horizontal exhaustion of all primary policies. We agree with the Continental plaintiffs, Federal and Century.

Under California law, "[a] decision of a court of appeal is not binding in the courts of appeal. One district or division may refuse to follow a prior decision of a different district or division . . . ." (Internal quotation marks omitted.) *McCallum* v. *McCallum*, supra, 190 Cal. App. 3d 315 n.4; see also *McGlothlen* v. *Dept. of Motor Vehicles*, 71 Cal. App. 3d 1005, 1017, 140 Cal. Rptr. 168 (1977); *Swinerton & Walberg Co.* v. *City of Inglewood-Los Angeles County Civic Center Authority*, 40 Cal. App. 3d 98, 101, 114 Cal. Rptr. 834 (1974); see also 9 B. Witkin, Cal. Procedure (3d Ed. 1985) Appeal, § 772, pp. 740–41. Accordingly, we conclude that we are not required to follow the decision of the First District Court of Appeal in *SantaFe Braun*.[22] Instead, we follow the long line of California cases that adhere to the well settled rule under California law that an excess policy does not cover a loss until all primary insurance has been exhausted. See *McConnell* v. *Underwriters at Lloyd's of London*, 56 Cal. 2d 637, 646, 365 P.2d 418, 16 Cal. Rptr. 362 (1961) ("excess insurance does not attach until all primary insurance has been exhausted"); *Deere & Co.* v. *Allstate Ins. Co.*, 32 Cal. App. 5th 499, 516, 244 Cal. Rptr. 3d 100 (2019) ("excess insurance

contracts do not respond to losses unless and until there has been full and proper exhaustion of primary insurance" (internal quotation marks omitted)), review denied, California Supreme Court, Docket No. S255410 (June 12, 2019); *North American Capacity Ins. Co.* v. *Claremont Liability Ins. Co.*, 177 Cal. App. 4th 272, 293, 99 Cal. Rptr. 3d 225 (2009) ("under the California rule of 'horizontal exhaustion,' all primary insurance must be exhausted before an excess carrier must 'drop down' to defend an insured, particularly in cases of continuing loss"); *Padilla Construction Co.* v. *Transportation Ins. Co.*, supra, 150 Cal. App. 4th 986 ("California's rule of 'horizontal exhaustion' in liability insurance law requires all primary insurance to be exhausted before an excess insurer must 'drop down' to defend an insured, including in cases of continuing loss"); *Carmel Development Co.* v. *RLI Ins. Co.*, 126 Cal. App. 4th 502, 514, 24 Cal. Rptr. 3d 588 (2005) ("[t]he inapplicability of secondary coverage until exhaustion of primary limits generally holds true even where there is more underlying primary insurance than contemplated by the terms of the secondary policy" (internal quotation marks omitted)), review denied, California Supreme Court, Docket No. S131568 (March 30, 2005); *American Casualty Co.* v. *General Star Indemnity Co.*, 125 Cal. App. 4th 1510, 1520, 24 Cal. Rptr. 3d 34 (2005) (excess carrier had no liability under excess policy "until exhaustion of all applicable primary policies"); *Travelers Casualty & Surety Co.* v. *Transcontinental Ins. Co.*, supra, 122 Cal. App. 4th 959 (referencing settled rule that excess policy does not cover loss until all primary insurance has been exhausted); *Reliance National Indemnity Co.* v. *General Star Indemnity Co.*, 72 Cal. App. 4th 1063, 1076–77, 85 Cal. Rptr. 2d 627 (1999) ("[t]he Courts of Appeal have held [that] '[i]t is settled under California law that an excess or secondary policy does not cover a loss, nor does any duty to defend the insured arise until all of the primary insurance has been exhausted' " (emphasis omitted)); *Fireman's Fund Ins. Co.* v. *Maryland Casualty Co.*, 65 Cal. App. 4th 1279, 1305, 77 Cal. Rptr. 2d 296 (1998) ("true excess insurer—one that is solely and explicitly an excess insurer providing only secondary coverage—has no duty to defend or indemnify until all the underlying primary coverage is exhausted"); *Community Redevelopment Agency* v. *Aetna Casualty & Surety Co.*, supra, 50 Cal. App. 4th 340 ("Absent a provision in the excess policy *specifically describing* and *limiting* the underlying insurance, a horizontal exhaustion rule should be applied in continuing loss cases . . . . In other words, all of the primary policies in force during the period of continuous loss will be deemed primary policies to each of the excess policies covering that same period. Under the principle of horizontal exhaustion, *all* of the primary policies must exhaust before *any* excess will have coverage exposure." (Emphasis in original.)); *Stonewall*, supra, 46 Cal. App. 4th 1850 ("'[l]iability under a secondary [excess] policy

will not attach until all primary insurance is exhausted, even if the total amount of primary insurance exceeds the amount contemplated in the secondary policy' "); *Hartford Accident & Indemnity Co.* v. *Superior Court*, 23 Cal. App. 4th 1774, 1779, 29 Cal. Rptr. 2d 32 (1994) ("[l]iability under an excess policy attaches only after all primary coverage has been exhausted" (internal quotation marks omitted)); *Diamond Heights Homeowners Assn.* v. *National American Ins. Co.*, 227 Cal. App. 3d 563, 570, 277 Cal. Rptr. 906 (1991) ("all primary or underlying insurance must be exhausted before excess coverage becomes effective"), review denied, California Supreme Court, Docket No. S019821 (May 16, 1991); *North River Ins. Co.* v. *American Home Assurance Co.*, supra, 210 Cal. App. 3d 112 ("[l]iability under an excess policy attaches only after all primary coverage has been exhausted"); *Olympic Ins. Co.* v. *Employers Surplus Lines Ins. Co.*, supra, 126 Cal. App. 3d 600 ("A secondary policy, by its terms, does not apply to cover a loss until the underlying primary insurance has been exhausted. This principle holds true even where there is more underlying primary insurance than contemplated by the terms of the secondary policy.").

The California Supreme Court stated its support for this well settled rule of law in *McConnell* v. *Underwriters at Lloyd's of London*, supra, 56 Cal. 2d 637. In that case, the excess insurer alleged that, if the court determined that two primary policies covered the accident at issue, then the liability of the excess insurer could not attach until the combined limits of both of those policies had been exhausted. Id., 646. The California Supreme Court stated that that contention "appear[ed] to be correct." Id. The language of the excess policy at issue in that case, which is similar to the language of the policies at issue in the present case, provided that liability " 'shall not attach unless and until the Primary Insurers shall have admitted liability for the Primary Limit or Limits, or unless and until the Assured has by final judgment been adjudged to pay a sum which exceeds such Primary Limit or Limits.' Under such circumstances it is held that the excess insurance does not attach until all primary insurance has been exhausted." Id. Furthermore, to the extent that one of the primary insurers had become insolvent, the court stated that "it is noted that insolvency of a primary insurer gives rise to liability under the excess policy, after, of course, any other primary coverage has been exhausted." Id. It is important to note that, although *McConnell* did not involve a long-tail claim, the court, at no point, limited its determination that all primary coverage must be exhausted before liability of the excess policy could attach to the primary coverage stated in the excess policy only, as evidenced by its reference to the exhaustion of "any other primary coverage . . . ." Id.

Accordingly, under the facts of the present case, we

disagree with Rohr's claim that *SantaFe Braun* should apply to the issue of whether horizontal exhaustion of the primary policies is required.

## 3

### California Case Law

Having determined that the California Supreme Court's application of a rule of vertical exhaustion to excess policies in *Montrose III* has no bearing on our determination of the issue in the present case of whether the trial court erred in determining that the underlying primary policies had to be horizontally exhausted before liability under the excess policies could attach, and also having determined that we are not required to follow the decision of the First District Court of Appeal in *SantaFe Braun*, we next look to relevant California case law for guidance in our resolution of the issue concerning horizontal exhaustion of primary policies in this case involving a continuous loss claim. We conclude, on the basis of that case law, that the trial court properly determined that horizontal exhaustion of all primary insurance was required in the present case.

The primary issue addressed by the California Court of Appeal in *Community Redevelopment Agency* v. *Aetna Casualty & Surety Co.*, supra, 50 Cal. App. 4th 329, which is directly on point to the issue presented in the present appeals, was "whether an excess insurer, under policy provisions such as those presented [in that case], has any obligation, in a continuing loss case, to 'drop down' and provide a defense to a common insured before the liability limits of *all* primary insurers on the risk have been exhausted." (Emphasis in original.) Id., 332. The court answered that question in the negative, and its reasoning is relevant to our analysis of the issue concerning horizontal exhaustion in the present case. See id.

*Community Redevelopment Agency* involved a redevelopment project in the Los Angeles area in which mass grading and filling was performed improperly, resulting in building pads that were defective and damaged, which, in turn, caused continuing damage to the structures and improvements located thereon as a result of the continual settling of the pads. Id., 333–34. United Pacific Insurance Company (United) and State Farm Fire and Casualty Insurance Company (State Farm) had issued commercial general liability policies that provided coverage for the related property damage claims. Id., 334. Additionally, the developer had purchased an umbrella policy from Scottsdale Insurance Company (Scottsdale) that was specifically excess to the State Farm policy, although not exclusively excess. Id. Although State Farm's liability limits had been reached and exhausted, United's limits had not been exhausted. Id., 340. United argued that because Scotts-

dale's policy expressly provided that it was excess to the State Farm policy, Scottsdale's duty to provide a defense arose upon the exhaustion of State Farm's liability limits. Id., 341.

The California Court of Appeal rejected United's claim that Scottsdale's duty to provide a defense arose upon the exhaustion of State Farm's liability limits, explaining that because the other provisions of the Scottsdale policy do not limit coverage to only the excess over the limits of the State Farm policy but, rather, expressly extend coverage to " 'the applicable limits of *any other underlying insurance* collectible by the [insureds]' . . . [t]he only reasonable interpretation of this policy language is that the term 'underlying insurance' must be read to include all available primary insurance, not just the policy expressly listed on the schedule of underlying insurance." (Emphasis in original.) Id. In reaching that conclusion, the court explained: "If an excess policy states that it is excess over a specifically described policy and will cover a claim when that specific primary policy is exhausted, such language is sufficiently clear to overcome the usual presumption that *all* primary coverage must be exhausted. However, that is not the case here. As the quoted provisions of Scottsdale's policy make clear . . . it was intended to be excess to *all* underlying insurance, whether such insurance was described in the schedule of underlying insurance or not." (Citation omitted; emphasis in original.) Id., 340 n.6. The court further stated: " '[W]e must conclude that when a policy which provides excess insurance above a stated amount of primary insurance contains provisions which make it also excess insurance above *all other* insurance which contributes to the payment of the loss together with specifically stated primary insurance, *such clause will be given effect as written.*' . . . In other words, an excess insurer can require in its policy that all primary insurance be first exhausted. Consistent with the horizontal rule, that is what Scottsdale effectively did in this case. Because exhaustion of all available primary (or underlying) insurance never occurred, Scottsdale's duty, under the terms of its policy, to 'drop down' and provide a defense never arose." (Citation omitted; emphasis in original.) Id., 341; see also *Peerless Casualty Co.* v. *Continental Casualty Co.*, supra, 144 Cal. App. 2d 625; cf. *Travelers Casualty & Surety Co.* v. *Transcontinental Ins. Co.*, supra, 122 Cal. App. 4th 959 (concluding that, unlike language of umbrella policy in *Community Redevelopment Agency*, language of excess policy was " 'sufficiently clear' " to trigger defense obligations of excess insurer upon exhaustion of underlying insurance as defined in policy, regardless of existence of other insurance).

The court in *Community Redevelopment Agency* further stated: "It is settled under California law that an excess or secondary policy does not cover a loss, nor

does any duty to defend the insured arise, until *all* of the primary insurance has been exhausted. . . . The California general rule that *all* primary insurance must be exhausted before a secondary insurer will have exposure favors and results in what is called 'horizontal exhaustion.' This is contrasted with 'vertical exhaustion' where coverage attaches under an excess policy when the limits of a specifically scheduled underlying policy [are] exhausted and the language of the excess policy provides that it shall be excess only to that specific underlying policy.

"This is a particular problem in continuous loss cases, such as the one before us. In such cases, primary liability insurers may have exposure to defend (and perhaps indemnify) claims arising before or after the effective dates of such policies. As a result of the [California] Supreme Court's conclusion that a continuing or progressively deteriorating condition which causes damage or injury throughout more than one policy period will potentially be covered by *all* policies in effect during those periods . . . the 'horizontal exhaustion' versus 'vertical exhaustion' issue will become an increasingly common one to be resolved. . . . Absent a provision in the excess policy *specifically describing* and *limiting* the underlying insurance, a horizontal exhaustion rule should be applied in continuous loss cases because it is most consistent with the principles enunciated in *Montrose* [*I*]. In other words, all of the primary policies in force during the period of continuous loss will be deemed primary policies to each of the excess policies covering that same period. Under the principle of horizontal exhaustion, *all* of the primary policies must exhaust before *any* excess will have coverage exposure." (Citations omitted; emphasis in original; footnote omitted.) *Community Redevelopment Agency* v. *Aetna Casualty & Surety Co.*, supra, 50 Cal. App. 4th 339–40.

Applying the principles of *Community Redevelopment Agency* to the present case, we conclude that the trial court properly applied a rule of horizontal exhaustion.[23] The Harbor and London excess policies similarly define ultimate net loss to mean "the amount payable in settlement of the liability of the Assured after making deductions for all recoveries and for other valid and collectible insurances . . . ." Where, as here, general excess policies like the ones at issue in the present case provide "excess insurance above a stated amount of primary insurance [and] [contain] provisions which make [them] also excess insurance above all other insurance which contributes to the payment of the loss together with the specifically stated primary insurance, such clause[s] will be given effect as written." *Peerless Casualty Co.* v. *Continental Casualty Co.*, supra, 144 Cal. App. 2d 625. For this court to ignore the plain language of the excess policies making them excess to "other valid and collectible insurances," in addition to the specifically stated underlying policies, would be to

ignore the language of the contracts as written, which is contrary to rules of insurance contract interpretation under California law. See, e.g., *La Jolla Beach & Tennis Club, Inc.* v. *Industrial Indemnity Co.*, 9 Cal. 4th 27, 37, 884 P.2d 1048, 36 Cal. Rptr. 2d 100 (1994); see also *Travelers Casualty & Surety Co.* v. *Transcontinental Ins. Co.*, supra, 122 Cal. App. 4th 955. We conclude, therefore, that an examination of the policy provisions at issue in the excess policies supports our decision not to apply the rule of vertical exhaustion set forth in *SantaFe Braun*. Instead, the rule of horizontal exhaustion set forth in *Community Redevelopment Agency* and the other California cases cited in part III B 2 of this opinion should be applied in the circumstances of the present case.

Rohr cites *Continental Ins. Co. II*, supra, 15 Cal. App. 5th 1017, in support of its claim that a rule of vertical exhaustion should apply. In that case, the state of California brought an action to recover from various insurers for costs related to the cleanup of hazardous waste. Id., 1022. Following a remand from the California Supreme Court, the parties filed motions for summary judgment concerning the issue of whether the policies issued by Continental Insurance Company and Continental Casualty Company "attached immediately upon exhaustion of the specified retention for the specified policy period (vertical exhaustion) or only upon exhaustion of all retentions across all policy periods (horizontal exhaustion)." Id., 1026. The trial court ruled that vertical exhaustion applied, and the Court of Appeal agreed. Id.; see id., 1037. In reaching that conclusion, the court found that *Community Redevelopment Agency* was not controlling because it "involved true primary policies"; id., 1036; whereas, in *Continental Ins. Co. II*, "the applicable policies were not neatly divided into a primary level and an excess level. With one negligible exception, all of the applicable policies were excess to a retention.[24] . . . Thus, no policy was written as excess to any other specified policy . . . ." (Emphasis omitted; footnote added; footnote omitted.) Id., 1034. The court further explained: "*Community [Redevelopment Agency]* reasoned that a primary policy is qualitatively different from an excess policy; the defense and indemnity obligations under a primary policy are immediate, whereas under an excess policy, they are merely contingent. Thus, an excess insurer should not be required to defend or to indemnify as long as any primary insurer is still sitting on its hands. The same is not true of two insurers [that] have issued policies that are excess to a retention. Their defense and indemnity obligations are both contingent, and they have priced their premiums accordingly. We cannot say, from their relationship alone, that either one should have to exhaust before the other is liable." (Footnote omitted.) Id., 1034–35; see also *Montgomery Ward & Co.* v. *Imperial Casualty & Indemnity Co.*, 81 Cal. App.

4th 356, 364, 97 Cal. Rptr. 2d 44 (2000) (self-insurance retentions "are not primary insurance and the principle of horizontal exhaustion does not apply"). Accordingly, the circumstances of *Continental Ins. Co. II*, in which the court applied a rule of vertical exhaustion, do not apply to the present case.

We conclude that the trial court did not err in determining that Rohr was required to horizontally exhaust all primary insurance before the liability of its excess insurers could attach.

### C

### Exhaustion of Primary Policies

Rohr's final claim related to the summary judgment rendered in favor of the Continental plaintiffs is that the trial court erred in concluding that actual payment by Royal of its policy limits was required to exhaust those policies in order for Rohr to be able to access the excess policies of the Continental plaintiffs. Rohr's claim is based on the fact that the trial court, in its memorandum of decision, stated that Arrowood had "paid less than [the] per occurrence limits of its policies to Rohr. Because the limits *have not been paid in full*, the exhaustion necessary before the Harbor and London excess policies may be triggered remains unsatisfied." (Emphasis added.) We disagree with Rohr.

In support of its claim, Rohr claims that a reversal of the trial court's judgment is required for three reasons. First, Rohr claims that "the language of all of the Federal and Century excess policies and one Continental umbrella policy makes clear that actual payment of underlying policies is not required. Instead, exhaustion can be proved by evidence that the loss attributable to a single occurrence is greater than the attachment point of the excess policies—the subject of a future phase of trial.[25] Second, the remaining Continental policies and Lloyd's policies only require maintenance of underlying primary policies during the 'currency' of the policy term—meaning that once the policy term had expired, Rohr was free to compromise the underlying policies and fill any gap created by that compromise. Third, and alternatively, Royal and all relevant underlying insurers continue to be defendants in this litigation, subject to contribution claims of other insurers. As such, the liability of the Royal and other policies for coverage of the underlying environmental claims can be determined in this case, thereby fulfilling the exhaustion requirements in the Continental and Lloyd's policies." (Footnote added.)

In opposition to Rohr's claim, the Continental plaintiffs allege that full payment by Royal of the limits of the Royal primary policies is necessary for the excess policies to respond. Specifically, they claim that the trial court "correctly held that where excess policies, like the Continental and London policies here, contain

language that states the policies will not attach until the primary insurer has paid or been held liable to pay the full underlying limit (the exhaustion clause), full payment of the underlying primary policy by the primary insurer is required before the excess policy responds."

Our analysis of this claim is guided by *Qualcomm, Inc.* v. *Certain Underwriters at Lloyd's, London*, supra, 161 Cal. App. 4th 184. In that case, the defendant excess insurer had refused to pay under its excess policy after Qualcomm, Inc. (Qualcomm), entered into a settlement with its primary insurer over a coverage dispute related to a class action lawsuit, which was for an amount that was less than the $20 million limit of the primary insurer's policy. Id., 187–88, 189. Qualcomm filed an appeal after the trial court ruled that the excess coverage had not been triggered. Id. Pursuant to the language of the exhaustion provision in the limit of liability clause of the excess policy, the excess insurer would be liable "*only after* the insurers under each of the Underlying policies *have paid* or *have been held liable to pay* the *full amount* of the Underlying Limit of Liability," which was $20 million under the primary policy. (Emphasis in original; internal quotation marks omitted.) Id., 195.

The California Court of Appeal for the Fourth District concluded that "the phrase 'have paid . . . the full amount [of $20 million]' . . . cannot have any other reasonable meaning than actual payment of no less than the $20 million underlying limit." Id. Moreover, with respect to the language, " 'have been held liable to pay the full amount of [$20 million]' "; id., 196; the court stated: "We need not decide whether the phrase 'held liable to pay' is susceptible of more than one reasonable meaning, because even assuming arguendo the phrase is ambiguous and we interpret it in Qualcomm's favor to include responsibility for payment under a settlement agreement, Qualcomm's complaint does not indicate (nor does Qualcomm argue) that the settlement between it and [its primary insurer] required [the primary insurer] to accept responsibility or liability for the *full amount* of the $20 million limit on the underlying policy. Nor does the complaint plead that [the primary insurer] was obligated to pay $20 million pursuant to a court order or judgment, which would plainly fall within such policy language. By the term of the excess policy requiring [the primary insurer] be 'held liable to pay' the 'full amount' of the underlying limit before [the excess insurer's] liability attaches (even if it does not *actually* pay . . .) [the excess insurer] is under no obligation to provide excess coverage." (Citation omitted; emphasis in original; footnote omitted.) Id., 196-97. Accordingly, the court in *Qualcomm, Inc.*, concluded that, pursuant to the plain and unambiguous language of the excess policy, the defendant excess insurer's obligation did not arise because "the primary insurer neither paid the 'full amount' of its liability limit nor

had it become legally obligated to pay the full amount of the primary liability limit in the parties' settlement agreement."[26] Id., 188; see also *Span, Inc.* v. *Associated International Ins. Co.*, 227 Cal. App. 3d 463, 468, 277 Cal. Rptr. 828 (1991) (language of excess policy was not ambiguous where it required exhaustion of underlying limit by payment before excess insured was required to respond and, therefore, exhaustion by insolvency of primary insurer was not sufficient), review denied, California Supreme Court, Docket No. S019870 (April 25, 1991).

Pursuant to the attachment of liability clause in Harbor excess policy 102211, liability to pay under the policy does not attach "unless and until the Primary and Underlying Excess Insurers shall have admitted liability for the Primary and Underlying Excess Limit(s) or unless and until the Assured has by final judgment been adjudged to pay an amount which exceeds such Primary and Underlying Excess Limit(s) and then only after the Primary and Underlying Excess Insurers have paid or have been held liable to pay the full amount of the Primary and Underlying Excess Limit(s)." With the exception of the Harbor umbrella policy, the other Harbor excess policies at issue in these appeals contain either identical or substantially similar language; see footnotes 10 and 11 of this opinion; as do the London excess policies. See footnote 12 of this opinion. Therefore, in light of the plain language of the policies, the trial court's determination that payment of the full limits of the primary policies was necessary for exhaustion to be satisfied was proper. The court, however, nevertheless improperly determined that the necessary exhaustion of the Royal primary policies remained unsatisfied. This court has determined that the exhaustion of all primary insurance is required before an excess insurer is obligated to respond; see part III B of this opinion; and that the Royal primary policies each provide coverage of $2 million per occurrence for a combined total of $4 million. See part III A of this opinion. Because Rohr has entered into and received payment pursuant to a settlement concerning the Royal primary policies for an amount that exceeds $4 million, under the circumstances here, exhaustion by payment of the full amount of the limits of the Royal primary policies has been satisfied.[27] This determination applies to the Harbor and London excess policies with two noted distinctions. With respect to London policy V20621, which was found to be specifically excess to London policy V20620, the trial court found that policy V20621 will be immediately triggered upon exhaustion of policy V20620, but that because V20620 could not be accessed prior to exhaustion of all primary policies, which the court found could not take place, policy V20621 likewise would be inaccessible. In light of our determination of the liability limits of the Royal primary policies and that, because the amount of the settlement

with and payment by Arrowood under those policies exceeded their limits, exhaustion of those primary policies has been satisfied, we disagree with the trial court's conclusion regarding the inaccessibility of policy V20621.[28] Moreover, with respect to Harbor umbrella policy 108909, the trial court again determined that no liability under the umbrella policy could attach until the underlying primary insurance has been exhausted by payment of the liability limits. Given our determination regarding the exhaustion of the underlying insurance, liability under the Harbor umbrella policy attaches.

### D

### Conclusion

In summary, because Arrowood, as successor to Royal, has paid Rohr more than the per occurrence limits of its policies, the exhaustion requirement with respect to the Royal primary policies has been satisfied. Thus, the trial court's conclusion that the excess policies of the Continental plaintiffs could never attach was incorrect. Therefore, the trial court improperly granted the motion for partial summary judgment filed by the Continental plaintiffs and determined that they were entitled to judgment as a matter of law. Instead, the court should have granted the motion for summary judgment filed by Rohr with respect to the Continental plaintiffs.

### IV

### FEDERAL'S MOTION FOR SUMMARY JUDGMENT

In its appeal in Docket No. AC 41537, Rohr challenges the judgment of the trial court granting the motion for summary judgment filed by Federal.[29] We conclude that the trial court properly granted Federal's motion for summary judgment.

In addressing Federal's motion for summary judgment, the trial court stated: "Federal issued three excess policies to Rohr effective from August 1, 1982 through August 1, 1985. Federal argues that, pursuant to the principle of horizontal exhaustion, all policies in effect during any part of the period of continuous loss potentially are liable up to their limits. Federal reasons that the present case involves claims of property damage beginning in the 1940s and continuing past 1985, and that the Royal policies and the Federal policies were both on the risk for portions of that period. Accordingly, it argues that all primary policies are deemed primary to any excess policies covering any part of the period of continuous loss. See *Community Redevelopment Agency* v. *Aetna Casualty & Surety Co.*, supra, 50 Cal. App. 4th 339. Federal concludes that, accordingly, although its policies were issued to cover later policy periods than the Royal policies, they cannot be reached until all primary policies have been exhausted.

"In support of its assertion that all underlying policies have not been exhausted, Federal relies on the fact that Rohr entered into settlement agreements for less than the full limits with Arrowood on the Royal primary policies, and also with First State Insurance Company (First State) and Twin City Fire Insurance Company (Twin City),[30] which issued excess policies directly underlying the Federal policies during the August 1, 1982, to August 1, 1985 policy periods.

"In its opposition, Rohr maintains that the Federal policies do not require it to collect any specific amount from any particular insurer as a condition to coverage, and that the Federal policies are liable toward the loss once Rohr's damages meet the fixed attachment points of the Federal excess policies. Additionally, Rohr argues that Federal's policies do not contain an exhaustion provision or a provision requiring full payment from any underlying policies before the Federal policies are triggered. In the absence of such a provision, Rohr asserts, settlement with underlying insurers does not forfeit Rohr's coverage under the Federal policies. In such circumstances, Rohr asserts that it becomes 'self-insured' for the loss until the amount of the claims reach the Federal policies' excess layer. Moreover, Rohr argues that the Federal policies do not clearly and unequivocally inform Rohr that they intend to be in excess of all primary insurance and all excess insurance and, accordingly, do not require horizontal exhaustion." (Footnote added.)

On appeal, Federal and Century joined in and adopted the brief filed by the Continental plaintiffs concerning the issues of horizontal exhaustion and the lack of exhaustion of the underlying policies. They also filed a separate brief to address the legal issues related to the excess policies they had issued between 1982 and 1986. Their specific arguments will be addressed separately as they relate to each of the policies.

### A

### Federal Excess Policy 7936-07-90

We examine the provisions of the Federal excess policies. With respect to Federal excess policy 7936-07-90, the trial court stated: "The declarations applicable to policy 7936-07-90 for the period August 1, 1982, to August 1, 1983, identify it as an excess liability policy providing $10 million in excess coverage above the [Twin City] policy, which, in turn, provides $10 million above an additional $40 million in other underlying insurance. . . . The insuring agreement provides: [T]he Company agrees to pay on behalf of the Insured loss resulting from any occurrence Insured by the terms and provisions of the First Underlying Insurance policy scheduled in Item 6 of the Declarations . . . . The insurance afforded by this policy shall apply only in excess of and after all underlying insurance . . . has

been exhausted. . . . Underlying insurance is defined to mean all policies scheduled in Item 6 . . . . The Federal policy adopts and follows all the terms, conditions and provisions of policy 103926 issued by Twin City . . . .

"The court concludes that there is a specific relationship between the Federal and Twin City policies. This conclusion is underscored by the fact that the Federal policy adopts and follows the terms, conditions and provisions of the Twin City policy. Accordingly, a natural, unrestrained reading of the language permits the court to conclude that the Federal policy is specifically excess to the Twin City policy.

"The relevant provisions of the Twin City policy are as follows:

"Limits of Liability . . . The total liability of the Company for all ultimate net loss as the result of any one occurrence shall not exceed the limit of liability stated [in] the declarations as applicable to each occurrence. . . . [T]he total liability of the Company for all ultimate net loss because of . . . property damage to which this policy applies . . . shall not exceed the limit of liability stated in the declarations as aggregate . . . .

"Ultimate Net Loss: The total of the following amounts . . . (1) all sums which the insured . . . shall become legally obligated to pay as damages, whether by reason of adjudication or settlement, because of . . . property damage . . . .

"Other Insurance: The Insurance afforded by this policy shall be excess insurance over any other . . . Insurance . . . available to the Insured, whether or not described in the Schedule of Underlying Insurance Policies, and applicable to any part of ultimate net loss, whether such other insurance is stated to be primary, contributing, excess or contingent . . . .

"The court previously concluded that horizontal exhaustion of the primary policies is applicable to this case in which continuing property damage has been alleged across several decades, triggering multiple policy periods. The Royal [primary] policies, which are considered primary to all excess policies, have not paid their full limits. Additionally, the directly underlying Twin City policy [insurer] has settled with the insured for less than its full limits. The fact that the Federal policy is specifically excess to, and follows, the Twin City policy creates a sequential expectation as to when the Federal policy pays its limits because the Federal limits shall immediately follow the Twin City limits. The Twin City policy's other insurance clause provides, however, that its coverage is excess over any other valid and collectible insurance available to the insured. Moreover, the terms of the Federal policy expressly contemplate that a specified amount of coverage within the policy period will be exhausted, including the limits

of the Twin City policy, before its own limits are triggered.

"Construing the terms of the Federal and Twin City policies together and as a whole, the court acknowledges that, although horizontal exhaustion generally is being applied to the collective policy limits and policy periods in this case, the specific relationship between the Federal and Twin City policies would ordinarily require a vertical allocation scheme between the two policies, and the limits of the Federal policy would be immediately triggered once Twin City paid its limits. . . . In the present case, however, the court cannot conclude that the limits of this Federal excess policy are triggered, because the Twin City excess policy, and the Royal primary policies, which settled for less than their specified limits, constitute other valid insurance collectible by the insured. Therefore, the plain terms of the policies must be given effect as written. As an excess insurance policy providing coverage above a stated amount, the Federal policy must be considered excess insurance above all other available insurance . . . and cannot be expected to pay its limits until the applicable limits of any other underlying insurance collectible by the insured, including primary coverage which is still available, have been paid." (Citations omitted; internal quotation marks omitted.)

Federal claims that, although "the trial court to some degree fused the two distinct legal concepts on which the judgments for Century and Federal were based— and on which such judgments should be affirmed—any shortcomings in the trial court's analysis were ultimately immaterial because the final judgments are fully supported by the record." Specifically, Federal claims that "the fact that the trial court conflated the concept that an excess policy can 'follow form' to underlying policy terms and conditions with the concept that an excess policy can 'specifically follow' an underlying policy does not detract from the trial court's ultimate correct judgment for Federal." Federal explains that its 1982–1983 policy is a general excess policy that cannot be reached until "Rohr exhausts the $50 million in scheduled limits directly underlying it," and that, because its policy "does not contain any language specifically *identifying* and *limiting* the underlying coverage," it is excess over all of Rohr's primary insurance. (Emphasis in original.) Finally, Federal claims that its excess policy cannot be reached in light of Rohr's settlement with Twin City for less than the limits of the Twin City policy, and cites *Qualcomm, Inc.*, in support of its claim. In contrast, Rohr claims that, "[i]f the trial court was correct in concluding that [the Federal 1982–1983 policy] was specific excess, then vertical exhaustion should apply without regard to the existence of unexhausted policies in other years."

Pursuant to the plain terms of the 1982–1983 Federal

excess policy, Federal agreed to pay for loss resulting to the insured from any occurrence insured by the terms and provisions of the first underlying insurance policy—the Twin City policy. The Federal policy further provides that its coverage applies only in excess of and after the exhaustion of all underlying insurance as defined in item 6 of the schedule, which refers to the Twin City policy as the first underlying insurance policy and to various other insurance policies on file with the company totaling $40 million, and does not specifically mention the Royal primary policy. We need not decide whether the Federal 1982–1983 policy is a general excess policy or whether, as Federal claims, the trial court conflated any concepts. Regardless of whether the policy is specific or general excess, pursuant to its plain language, Rohr must exhaust $50 million in scheduled limits directly underlying the Federal policy before the Federal policy provides coverage. Notwithstanding our determination that the coverage limits of the Royal primary policies have been exhausted, the 1982–1983 Federal policy lists the $10 million Twin City policy as the first underlying insurance policy, with $40 million in other underlying insurance that must be exhausted for the insurer to cover a loss under the policy. The Twin City policy and the Federal policy constitute multiple layers of excess insurance, to which a rule of vertical exhaustion applies. See *Montrose III*, supra, 9 Cal. 5th 226. Thus, even if horizontal exhaustion of all of the $40 million in underlying insurance has occurred, exhaustion of the Twin City policy would still be required before coverage under the Federal policy attaches. Because Rohr has settled with Twin City, a directly underlying excess insurer to the Federal 1982–1983 policy, for less than the specified limits of the Twin City policy, the requisite exhaustion has not occurred. See *Qualcomm, Inc.* v. *Certain Underwriters at Lloyd's, London*, supra, 161 Cal. App. 4th 196–97. Accordingly, the trial court properly rendered summary judgment in Federal's favor with respect to its 1982–1983 excess policy.

B

Federal Excess Policies (84) 7936-07-90<br>And (85) 7936-07-90

With respect to Federal excess policies (84) 7936-07-90 and (85) 7936-07-90, the trial court stated: "Unlike Federal 7936-07-90, Federal policies (84) 7936-07-90 and (85) 7936-07-90 do not follow form to a directly underlying insurance policy; however, the insuring agreements for both policies require that the first designated underlying insurance and all underlying insurance pay their limits before the Federal policies pay their own limits. Federal policy (84) 7936-07-90 provides $10 million in excess coverage above the Twin City policy, which, in turn, provides $10 million above an additional $40 million in other underlying insurance. . . . The declara-

tions page for Federal policy (84) 7936-07-90 provides that coverage 'shall apply only in excess of and after *all underlying insurance* (*as scheduled in Item 6 of the Declarations*) *has been exhausted.*' . . . Item 6 of the Declarations identifies the Twin City policy as the first underlying insurance, in addition to various other underlying policies 'on file with company.' . . .

"Federal policy (85) 7936-07-90 provides $10 million in excess coverage above the First State policy, which in turn provides $10 million excess coverage. . . . The terms of Federal (85) 7936-07-90 include the same substantive language as Federal (84) 7936-07-90, except that it identifies the First State policy as the first underlying insurance. . . .

"Pursuant to their plain language, the court concludes that Federal policy (84) 7936-07-90 and (85) 7936-07-90 are general excess policies. In this case, the terms of the policies specify that coverage is intended to be 'in excess of and after all underlying insurance.' The Royal policies, which are considered primary to all excess policies covering the claims, and the directly underlying First State and Twin City excess policies, are 'underlying insurance.'

"The terms of the Federal policies expressly contemplate that a specified amount of underlying coverage will be exhausted, including the limits of the First State and Twin City policies. These policies have not paid their full limits, and, additionally, primary coverage under the Royal policies also remains available to the insured. The plain terms of the Federal policies must be given effect as written. As excess insurance policies providing coverage above a stated amount, the Federal policies must be considered excess insurance above all other available insurance . . . and cannot be expected to pay their respective limits until the applicable limits of any other underlying insurance, including primary coverage, have been paid." (Citations omitted; emphasis in original.) The court, thus, determined that Federal demonstrated that it was entitled to summary judgment in its favor.

For the same reasons we discussed with respect to the Federal 1982–1983 policy, we conclude that the trial court properly rendered summary judgment in favor of Federal with respect to the 1984 and 1985 policies. Regardless of whether horizontal exhaustion of all underlying primary insurance has occurred, the exhaustion of the first layer excess insurance policies—the First State policy and the Twin City policy—is required for coverage under these Federal policies to attach. Because Rohr entered into a settlement with First State and Twin City for less than the limits of their respective policies, there can be no exhaustion through payment of the limits of those policies. See *Qualcomm, Inc.* v. *Certain Underwriters at Lloyd's, London,* supra, 161 Cal. App. 4th 196–97.

Accordingly, the trial court properly granted Federal's motion for summary judgment.

V

CENTURY'S MOTION FOR SUMMARY JUDGMENT

In its appeal in Docket No. AC 41538, Rohr challenges the judgment of the trial court granting the motion for summary judgment filed by Century.[31] We conclude that the trial court properly granted Century's motion for summary judgment with respect to policy 00 73 01, but should have denied the motion as to policies ZCX8459, ZCX8609 and ZCX8634.

A

Century Excess Policy 00 73 01

The first of four policies issued by Century to Rohr was policy 00 73 01. The trial court stated the following with respect to this policy: "The declarations applicable to policy 00 73 01 for the period August 1, 1984, to August 1, 1985, identify it as a policy of excess insurance, providing $5 million in excess coverage above $25 million. . . . Item 3 of the declarations specifies that the $5 million policy limit is in excess of limits specified in item 2. Item 2 identifies the designated underlying insurance as a First State insurance [policy] with limits of $25 million excess of primary limits. . . . The policy further provides: This is a policy of excess insurance . . . . The insurance afforded by this Policy *shall follow* that of the designated underlying insurance . . . . Additionally, it provides that [t]his policy indemnifies the insured in accordance with the applicable insuring agreements, conditions . . . of the designated underlying insurance for excess loss . . . . The court concludes that there is a specific relationship between the Century and First State policies. This conclusion is underscored by the fact that the Century policy shares the same insuring agreements and conditions applicable to the First State policy. The Century policy also plainly provides that its coverage shall follow the First State policy. Accordingly, a natural, unrestrained reading of the policy leads the court to conclude that the Century policy is specifically excess to the First State policy.

"The relevant provisions of the First State policy are as follows:

"Underlying Limit-Retained Limit: The Company shall be liable only for the ultimate net loss in excess of the greater of the insured's: (A) Underlying Limit—an amount equal to the limits of liability indicated beside the underlying insurance listed in the Schedule A of underlying insurance, plus the applicable limits of any other underlying insurance collectible by the insured . . . .

"Ultimate Net Loss: Means the sums paid as damages in settlement of a claim or in satisfaction of a judgment

for which the insured is *legally liable after making deductions for all other recoveries, salvages and other insurances whether recoverable or not*, other than the underlying insurance and excess insurance purchased specifically to be in excess of this policy . . . .

"Other Insurance: If other collectible insurance with any other insurer is available to the insured covering a loss covered hereunder . . . the insurance hereunder shall be in excess of, and not contribute with such other insurance. . . .

"The court has already concluded that horizontal exhaustion is applicable to this case in which continuing property damage has been alleged across several decades, triggering multiple policy periods. The Royal policies, which are considered primary to all excess policies, have not paid their full limits. Additionally, the directly underlying First State policy has settled with the insured for less than its full limits. The fact that the Century policy is specifically excess to, and follows, the First State policy creates a sequential expectation as to when the Century policy pays its limits because the Century limits shall immediately follow the First State limits. The First State policy's other insurance clause provides, however, that coverage shall be in excess of, and not contribute with other collectible insurance. The First State policy's underlying limit-retained limit clause also requires the applicable limits of any other underlying insurance collectible by the insured to be paid before it will pay its own limits. Moreover, the terms of the Century policy expressly contemplate that a specified amount of coverage within the policy period will be exhausted, including the limits of the First State policy, before its own limits are triggered.

"Construing the terms of the Century and First State policies together and as a whole, the court acknowledges that, although horizontal exhaustion is being applied as a general rule to the collective policy limits and policy periods in this case, the specific relationship between the Century and First State policies would ordinarily require a vertical allocation scheme between the two policies, and the limits of the Century policy would be immediately triggered once First State paid its limits. . . . In the present case, however, the court cannot conclude that the limits of this Century excess policy are triggered because the First State excess policy, and the Royal primary policies, which settled for less than their specified limits, constituted other valid insurance collectible by the insured. Therefore, the plain terms of the policies must be given effect as written. As an excess insurance policy providing coverage above a stated amount, the Century policy must be considered excess insurance above all other available insurance . . . and cannot be expected to pay its limits until the applicable limits of any other underlying insur-

ance collectible by the insured, including primary coverage which is still available, have been paid." (Citations omitted; emphasis in original; internal quotation marks omitted.)

Although we disagree with the trial court's conclusion that the limits of the Royal primary policies have not been exhausted, its decision rendering summary judgment in favor of Century was nevertheless proper as to this Century policy. Because the directly underlying First State policy settled with the insured for less than its full limits, the coverage provided under Century policy 00 73 01 has not been triggered.

B

## Century Excess Policies ZCX8459, ZCX8609 and ZCX8634

From the period of August 1, 1985, to August 1, 1986, Century issued to Rohr three other excess policies that were substantially similar in content. The trial court concluded that those policies provided "three layers of excess coverage: ZCX8459 providing $5 million in excess coverage above $6.5 million; ZCX8609 providing $2.5 million in excess coverage above $21.5 million; ZCX8634 providing $2.5 million in excess coverage above $26.5 million. All of these policies indemnify the insured in accordance with the applicable insuring agreements, exclusions, and conditions of the designated underlying insurance. The designated underlying insurance is umbrella policy 15 71 09 issued by United Insurance Company (United policy)." (Citation omitted; internal quotation marks omitted.)

The court further stated: "The declarations of each respective policy plainly state that it is a policy of excess insurance and identifies the United policy as its designated underlying insurance. The Century policies clearly follow form to the United policy, as noted by the provision: The insurance afforded by this Policy shall follow that of the designated underlying insurance. . . . Accordingly, the court concludes that the Century policies issued during this period are specifically excess to the United policy.

"In the section entitled, Retained Limit-Limit of Liability, the United policy specifically limits its ultimate net loss to the total of the applicable limits of the underlying policies listed in Schedule A hereof, *and the applicable limits of any other insurance collectible by the insured* . . . .

"The plain language of the Century excess policies communicate the highly specific nature of each Century policy's relationship to a specifically identified underlying policy. The Century excess policy language also plainly provides that the limits are triggered once the specifically identified underlying policy has paid its limits. While the rule of horizontal exhaustion is generally applicable to policies covering claims involving a con-

tinuous long-tail loss, the Century policies, pursuant to their plain terms, are specific excess policies. This interpretation results from a natural, unrestrained reading of the terms, which provide that the Century limits are triggered once the designated underlying insurance pays its limits. In this circumstance, the language can only be interpreted as requiring a vertical exhaustion allocation scheme.

"The Century excess policies, therefore, must pay their limits immediately once the designated underlying insurance policy pays its limits. The designated underlying insurance policy, pursuant to its terms, is scheduled to pay its limits after all other collectible insurance has been paid to the insured. To the extent that the policies called upon involve the same occurrences covered by the Royal policies, the limits of the Century policies have not been triggered, given that all underlying insurance collectible by the insured has not been exhausted, as previously discussed in this memorandum." (Citations omitted; emphasis in original; internal quotation marks omitted.)

Again, we disagree with the trial court's conclusion that, with respect to the Royal primary policies, exhaustion of the underlying limits has not occurred. To the extent that this case concerns the issue of the satisfaction of the Royal primary policies, the trial court incorrectly determined that such satisfaction had not occurred. Accordingly, the court improperly determined that Century was entitled to summary judgment with respect to these policies because of the failure to fully exhaust the Royal primary policies.[32]

## VI

## CROSS APPEAL

In their cross appeal, the Continental plaintiffs claim that the trial court erred "when it held that the 1959 to 1971 Royal primary policies have per policy occurrence limits of only $8 million despite the policies' endorsements, which provide that each of the four Royal primary policies have annual period per occurrence limits that total $24 million . . . ." We disagree.

The arguments raised by the Continental plaintiffs in their cross appeal are similar to the ones they raised on direct appeal with respect to the issue of whether the $2 million per occurrence limits in the Royal primary policies may be annualized, which this court addressed and rejected in part III A 1 of this opinion. In addressing the annualization question in this opinion, we concluded that "the per occurrence language of each Royal primary policy provides coverage of up to $2 million for an occurrence that takes place during the policy period and not for each year of that policy period." See part III A 1 of this opinion. We also rejected the Continental plaintiffs' reliance on *Stonewall*, supra, 46 Cal. App. 4th 1849, on which they also rely to support

their claim on the cross appeal. Specifically, we concluded that because each Royal primary policy contained one endorsement providing for a policy period of three years and setting the limit of coverage at $2 million per occurrence, and because there is no language in the Royal primary policies or their declarations providing for coverage on a per occurrence, per year basis, *Stonewall* is factually distinguishable from the present case. We further concluded in part III A 2 of this opinion that because the extensions of the Royal primary policies did not provide additional per occurrence limits, the per occurrence limit of liability in each policy is $2 million and, thus, Rohr is entitled to coverage in the amount of $2 million per policy, for a combined total for the two policies of $4 million. In light of those determinations, we reject the claim of the Continental plaintiffs in the cross appeal that the Royal primary policies have annual period per occurrence limits that total $24 million. Accordingly, the cross appeal fails.

The judgment is reversed with respect to the granting of partial summary judgment in favor of the Continental plaintiffs, the granting of summary judgment in favor of Century with respect to policies ZCX8459, ZCX8609 and ZCX8634, and the denial of Rohr's motion for summary judgment with respect to the Continental plaintiffs, and the case is remanded with direction to deny the motions for summary judgment filed by the Continental plaintiffs and by Century with respect to policies ZCX8459, ZCX8609 and ZCX8634, and to grant Rohr's motion for summary judgment with respect to the Continental plaintiffs and for further proceedings thereon; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] In this opinion, we refer to Continental, Lloyd's and the London insurers individually by name where necessary and collectively as the Continental plaintiffs.

[2] The environmental claims involve seven sites located in California (Chula Vista, Riverside, Agricultural Park, Casmalia Resources Hazardous Waste Facility, BKK Landfill, Basin By-Product and Gibson Environment) and one site located in Missouri known as Hayford Bridge.

[3] Although only two of the Royal primary policies are at issue in these appeals, paragraph 235 of the plaintiffs' complaint identifies six policies issued to Rohr by Arrowood, as successor to Royal. The additional four policies are RTS 902220, PLX 120077, RTS 902223, and PTS 902224.

[4] The plaintiffs are Continental; Lloyd's; Berkshire Hathaway Direct Insurance Company, formerly known as American Centennial Insurance Company; Berkshire Hathaway Specialty Insurance Company, formerly known as Stonewall Insurance Company; Ocean Marine, as successor to certain policies subscribed to by Commercial Union Assurance Company PLC and/or General Accident Fire & Marine Life Assurance Corporation; Scottish Lion; Winterthur Swiss Insurance Corporation, Ltd.; Tenecom, formerly known as Yasuda Insurance Company; Nissan Fire & Marine Insurance Company, Ltd.; NRG N.V.; and Republic Insurance Company.

[5] The defendants are Rohr; Hartford Accident & Indemnity Company; Transport Insurance Company; Arrowood; First Charter Insurance Company, as successor in interest to Transportation Insurance, Ltd.; Allianz Underwriters Insurance Company; Allstate Insurance Company, as successor in interest to Northbrook Excess & Surplus Insurance Company; Chicago

Insurance Company; Employers Mutual Casualty Company; Federal; Fireman's Fund Insurance Company; Westport Insurance Corporation, as successor in interest to Puritan Insurance Company; Tudor Insurance Company; United Insurance Company; Twin City Fire Insurance Company; First State Insurance Company; Century; and Middlesex Insurance Company.

[6] Pursuant to paragraph 37 of their complaint, the plaintiffs alleged that the trial court had "jurisdiction over this matter pursuant to . . . General Statutes §[§] 52-59b and . . . 33-929 because, on information and belief, each of the parties transacts and does business in Connecticut and/or seeks the performance of the insurance contracts in Connecticut," and that the court had "authority to provide the declaratory relief requested pursuant to . . . General Statutes § 52-29 and . . . Practice Book [§§] 17-54 and 17-55."

[7] After the plaintiffs commenced this action, Federal and Century each filed thirty-two special defenses as well as cross claims against Rohr, to which Rohr filed special defenses. Rohr also filed special defenses in response to the complaint as well as a counterclaim against certain of the plaintiffs, including Continental; Lloyd's; Berkshire Hathaway Specialty Insurance Company, formerly known as Stonewall Insurance Company; Ocean Marine; Winterthur Swiss Insurance Corporation, Ltd.; Tenecom, formerly known as Yasuda Insurance Company; Nissan Fire & Marine Insurance Company, Ltd.; NRG N.V.; and Scottish Lion. Additionally, Rohr filed a cross claim against certain of the defendant insurers, and the counterclaim and cross claim defendants filed special defenses in response to Rohr's cross claim and counterclaim.

[8] In accordance with motions to seal filed by the parties, and after a hearing held thereon, the court, on April 5, 2017, ordered sealed, pursuant to Practice Book § 11-20A, certain documents that reflected the dollar amount and terms of the settlement, finding that "[t]he unredacted documents subject to [the] motion[s] to seal contain confidential settlement information" and that "[t]he privacy interests of certain of the parties to [the] litigation concerning the information in the unredacted documents overrides the public's interest in viewing the material." The documents that are subject to the order to seal include the memorandum in support of the motion for partial summary judgment filed by the Continental plaintiffs, Federal's memorandum in support of its joinder motion for summary judgment, Century's memorandum in support of its joinder motion for summary judgment, Rohr's memorandum in opposition to the motion for partial summary judgment filed by the Continental plaintiffs, Rohr's opposition to the joinder motions for summary judgment filed by Federal and Century, and the memorandum in opposition to Rohr's motion for summary judgment filed by the Continental plaintiffs. Subsequently, the documents in question were refiled with redactions concerning the information that is subject to the sealing order.

[9] The court also explained its use of the term "trigger of coverage": "In the third party liability insurance context, 'trigger of coverage' has been used by insureds and insurers alike to denote the circumstances that activate the insurer's defense and indemnity obligations under the policy. The term 'trigger of coverage' should not be misunderstood as a doctrine to be automatically invoked by a court to conclusively establish coverage in certain categories of cases, or under certain types of policies. The word 'trigger' is not found in the [comprehensive general liability] policies themselves, nor does the [California] Insurance Code enumerate or define 'trigger of coverage.' Instead, 'trigger of coverage' is a term of convenience used to describe that which, under the specific terms of an insurance policy, must happen in the policy period in order for the potential of coverage to arise. The issue is largely one of timing—what must take place within the policy's effective dates for the potential of coverage to be 'triggered'? Whether coverage is ultimately established in any given case may depend on the consideration of many additional factors, including the existence of express conditions or exclusions in the particular contract of insurance under scrutiny, the availability of certain defenses that might defeat coverage, and a determination of whether the facts of the case will support a finding of coverage." (Emphasis omitted.) *Montrose I*, supra, 10 Cal. 4th 655 n.2.

[10] Paragraph 101 of the complaint alleges that Harbor issued thirteen excess comprehensive liability policies to Rohr. In support of their motion for partial summary judgment, the Continental plaintiffs submitted the affidavit of Kelly M. Wolfe, an associate with the law firm that represents the Continental plaintiffs. In her affidavit, Wolfe references seven of those policies that were in effect at various times between 1964 and 1971, which

include policies 102211, 103152, 106597, 103633, 108053, 108908, and 108909. With the exception of the Harbor umbrella policy 108909, the six Harbor excess policies contain substantially the same terms and conditions, and the trial court found that "the slight differences between individual policies [were] of no significance." For convenience, we discuss policy 102211 and set forth key provisions and language that it has in common with the other policies. The trial court, in rendering its judgment, examined those policies contained in the trial court record, and we do the same. We also note that each of the Harbor excess policies that became effective January 1, 1971, or later contain a provision that excludes from coverage "any loss arising out of contamination or pollution." Accordingly, we limit our discussion to those policies in effect prior to January 1, 1971.

[11] Harbor excess policy 103152, which was in effect from August 1, 1965, to August 1, 1968, contained similar coverage limits, terms, definitions and conditions, as did Harbor excess policy 103633, which provided $5 million in coverage limits per occurrence and in the aggregate, and was effective February 26, 1966, to August 1, 1969. Harbor excess policy 103633 was excess to Harbor excess policies 103152 (until March 14, 1968) and 106597 (from March 14, 1968), and it was also excess to Royal primary policy RLP 144014. Furthermore, Harbor excess policy 108053, effective August 1, 1969, to December 1, 1969, and policy 108908, effective December 1, 1969, to June 1, 1973, both contained coverage limits up to $5 million per occurrence and in the aggregate, and contained terms that were substantially similar to the other Harbor excess policies. Finally, Harbor issued umbrella policy 108909, which was in effect from December 1, 1969, to June 1, 1973, provided coverage in the amount of $3 million per occurrence and in the aggregate, and was in excess to Harbor excess policy 108908 and to Royal primary policy RTS 902235. We discuss Harbor umbrella policy 108909 separately from the other Harbor excess policies. See parts II C and III C of this opinion.

[12] The Continental plaintiffs submitted an affidavit of Kelly M. Wolfe, an associate with the law firm that represents the Continental plaintiffs. In her affidavit, Wolfe references six of those policies that were in effect from 1966 to 1969, including policies V20620, V20621, V20622, V23801, V23802 and Certificate LA 41019, all of which contain substantially similar terms and conditions, except for policy V20621. The trial court, in rendering its judgment, examined those policies contained in the trial court record, and we do the same. See also parts II B 3 and III C of this opinion.

[13] See London excess policies V20620, V20622, V23801, V23802 and London Certificate LA 41019.

[14] The Continental plaintiffs cite *Peerless* for the rule that, "when a policy which provides excess insurance above a stated amount of primary insurance contains provisions . . . which make it also excess insurance above all other insurance which contributes to the payment of the loss together with the specifically stated primary insurance, such clause will be given effect as written." *Peerless Casualty Co.* v. *Continental Casualty Co.*, supra, 144 Cal. App. 2d 626.

[15] Harbor excess policies 102211, 103152, 106597, 103633, and 108053, and London excess policies V20620, V20622, V23801, V23802 and London certificate LA 41019 include schedules and endorsements that refer to Royal primary policy RLP 144014 as an underlying primary insurance policy. Harbor excess policy 108908 refers to Royal primary policy RTS 902235 as an underlying primary insurance policy, and London policy V20621 references "Royal Indemnity Company" as a primary insurer, along with three other primary insurers.

[16] The trial court found one exception—London excess policy V20621— to its conclusion that the Harbor and London excess policies were general excess policies. Specifically, the court stated: "Policy V20621 was 'subscribed to on the same terms, conditions, definitions and exclusions applicable to London . . . policy V20620.' . . . London . . . V20621 sits directly above London . . . V20620 in the coverage 'tower.' The language of London . . . V20621 plainly provides that this particular excess policy attaches to and forms part of London . . . V20620. . . .

"This language specifically describes the relationship between policies V20620 and V20621, and sufficiently overcomes the general presumption that all underlying insurance must be exhausted before V20621 responds to the claim. See *Community Redevelopment Agency* v. *Aetna Casualty & Surety Co.*, supra, 50 Cal. App. 4th 340 n.6. Instead, the language permits a natural conclusion that it is the intention of the parties for these two specific policies to be linked in such a manner so as to form one policy. Accordingly, the court concludes that London . . . V20621 is specifically excess to Lon-

don . . . V20620, and the policy limits provided under London . . . V20621 will be immediately triggered in accordance with its terms and upon exhaustion of London . . . V20620. Nevertheless, because V20620 itself, as previously concluded, cannot be exhausted or even accessed prior to exhaustion of all primary policies, V20621 will likewise be inaccessible prior to the exhaustion of all primary policies." (Citations omitted.) Although we agree that policy V20621 is specifically excess to policy V20620, we address the exhaustion issue and whether policy V20620 can be accessed in parts III A and C of this opinion.

[17] See footnote 8 of this opinion.

[18] The trial court did not make a determination regarding the number of occurrences at issue in this case. The court stated: "The court reaches no conclusion as to the number of occurrences at issue, and the record is insufficient at this time for a definitive determination of that question. Nevertheless, the court concludes, for the reasons that follow, that the Royal policies have not been exhausted, regardless of the number of occurrences at issue. . . . Accordingly, regardless of whether the case involves one occurrence, which would limit coverage under the policies to $8 million, or several occurrences, for which coverage, under the per occurrence and annual aggregate limits, might be as much as $24 million, the settlement amount did not exhaust the Royal policies."

[19] The court, however, found that the aggregate limits could be annualized. Specifically, the court found that because the aggregate limits under the Royal primary policies were triggered for each annual term that those policies were in effect, and because those policies provided "aggregate limits of $2 million for each of twelve annual terms, the total coverage potentially available in the aggregate under the Royal policies [was] $24 million."

[20] We disagree with the Continental plaintiffs with respect to this claim. Nowhere in *A.B.S. Clothing* did the court state that the *only* situation in which an extension would not constitute a new policy with a new contract period would be a circumstance in which the policy was continued indefinitely. Rather, the court merely stated, as an example of a continuous contract, a contract that includes terms establishing an intention that the policy be continued indefinitely. *A.B.S. Clothing*, supra, 34 Cal. App. 4th 1476. If that were a prerequisite to finding the existence of one continuous contract, the court would not have had to examine the policy provisions for ambiguity, as the policies at issue in that case had specific beginning and ending dates of coverage. See id., 1481.

[21] The decision, as modified, was published on May 27, 2020.

[22] Moreover, we find *SantaFe Braun* distinguishable for another reason as well. Despite the fact that the California Supreme Court in *Montrose III* clearly stated that its holding did not address the issue of "when or whether an insured may access excess policies before all primary insurance covering all relevant policy periods has been exhausted"; *Montrose III*, supra, 9 Cal. 5th 226 n.4; the court in *SantaFe Braun* nevertheless rendered its decision on the basis of *Montrose III*, concluding that it was compelled by the decision in *Montrose III* to find that all primary insurance covering all time periods did not need to be horizontally exhausted before the first level excess policies could be triggered. *SantaFe Braun*, supra, 52 Cal. App. 5th 28–30. As we have stated previously in this opinion, the application by the California Supreme Court of a rule of vertical exhaustion under the circumstances present in *Montrose III* has no bearing on our determination of the issue in the present case of whether the trial court erred in determining that the underlying primary policies had to be horizontally exhausted before liability under the excess policies could attach. We, thus, necessarily disagree with the decision of the court in *SantaFe Braun* that *Montrose III* governed its determination of the issue before it concerning the exhaustion of primary insurance, as opposed to the exhaustion of multiple layers of excess policies, which was at issue in *Montrose III*.

[23] We note that Rohr attempts to distinguish *Community Redevelopment Agency* on the ground that it involved a dispute between insurers. Specifically, Rohr alleges that "this case involves a dispute between Rohr and its insurers and, when a policyholder is involved, the priority must be on providing the policyholder with access to the excess insurance coverage it has paid for. *Community Redevelopment* [*Agency*], a dispute between insurers, is inapplicable here." Related to its attempt to distinguish *Community Redevelopment Agency*, Rohr also asserts that the differences between excess and primary insurance do not compel a conclusion supporting a rule of horizontal exhaustion. We are not persuaded by either claim, especially given that the application of a rule of horizontal exhaustion will not deprive

Rohr of access to its excess insurance from the Continental plaintiffs.

[24] In *Continental Ins. Co. II*, supra, 15 Cal. App. 5th 1030, the court explained that "[m]ost excess policies are written as excess to a specified primary policy. Alternatively, however, a policy may be written as excess to an insured's retention. The term retention . . . refers to a specific sum or percentage of loss that is the insured's initial responsibility and must be satisfied before there is any coverage under the policy." (Internal quotation marks omitted.)

[25] We address the summary judgment rendered in favor of Federal and Century separately in this opinion. See parts IV and V of this opinion, respectively.

[26] The court in *Qualcomm, Inc.* v. *Certain Underwriters at Lloyd's, London*, supra, 161 Cal. App. 4th 204, also rejected Qualcomm's claim that the public policy of promoting settlement compelled the conclusion that the defendant excess insurer was obligated to pay, even if the obligation contravened the language of the policy. The court stated: "Whatever merit there may be to conflicting social and economic considerations, they have nothing whatsoever to do with our interpretation of the unambiguous contractual terms. . . . If contractual language in an insurance contract is clear and unambiguous, it governs, and we do not rewrite it for any purpose. . . . Our conclusion is consistent with the authority on which Qualcomm relies, *Signal* [*Cos.*] v. *Harbor Ins. Co.*, [27 Cal. 3d 359, 365–67, 612 P.2d 889, 165 Cal. Rptr. 799 (1980)], in which the California Supreme Court found no compelling equitable consideration to impose an obligation on an excess carrier, contrary to the language of its excess policy, to reimburse a primary carrier for defense costs where those costs were incurred before exhaustion of the primary policy limits. . . . The court expressly decline[d] to formulate a definitive rule applicable in every case in light of varying equitable considerations which may arise, and which may affect the insured and the primary and excess carriers, and which depend upon the particular policies of insurance, the nature of the claim made, and the relation of the insured to the insurers. . . . Taking *Signal*'s lead, we affirm the judgment based on the excess policy language and underlying circumstances of this particular case." (Citations omitted; internal quotation marks omitted.) *Qualcomm, Inc.* v. *Certain Underwriters at Lloyd's, London*, supra, 204.

[27] The trial court noted that it made "no determination at [that] time that the primary policies are the *only* policies that must be exhausted before the Harbor and London policies will provide coverage. As previously noted, some of the policies may have other levels of coverage intervening between them and the primary policies. The present motions, however, seek only a determination of whether coverage under the Harbor and London policies is unavailable *because the primary policies have not been exhausted*. Accordingly, the court is not called upon at this time to determine whether any additional policies within Rohr's insurance coverage portfolio must also be exhausted before coverage is available under the Harbor and London policies." (Emphasis in original.)

[28] We further note that London policy V20621 lists Royal Indemnity Company as one of four primary insurers under the policy. See footnote 15 of this opinion. Our determination that the exhaustion requirement has been satisfied is limited to the exhaustion of the Royal primary policies only. See footnote 27 of this opinion.

[29] Rohr raises the same claims on appeal concerning the granting of the motions for summary judgment filed by Federal and Century as it does with respect to the granting of the Continental plaintiffs' motion for summary judgment, namely, that the trial court erred in concluding that (1) the Royal primary policies provided per occurrence limits in the amount of $8 million, (2) the underlying primary insurance policies had to be horizontally exhausted before any excess policies could attach to provide coverage, and (3) Rohr was required to be paid the $8 million policy limit before it could access its excess insurance policies.

[30] In addition to its settlement with Arrowood, on December 10, 2014, Rohr entered into a settlement agreement with the defendant insurers Hartford Accident & Indemnity Company, First State and Twin City.

[31] See footnote 29 of this opinion.

[32] Additionally, pursuant to the plain terms of these Century policies, their coverage obligations are not triggered unless and until the directly underlying United policy has paid its limits, which can occur only after the insured has been paid all other collectible insurance. The issue concerning the exhaustion of the United policy is not before us in these appeals and is a matter to be addressed in the next stage of the proceedings before the

trial court.

_____